JONATHAN G., By and Through his parents and natural guardians, CHARLIE JOE G. and Janet G.

v.

CADDO PARISH SCHOOL BOARD, et al.

No. 92–1531.

United States District Court,
W.D. Louisiana,
Shreveport Division.

Dec. 20, 1994.

Margherita McWilliams, Shreveport, LA, for plaintiffs.

Fred H. Sutherland, Beard & Sutherland, Shreveport, LA, for defendants.

### MEMORANDUM RULING

PAYNE, United States Magistrate Judge.

The parents of Jonathan G., a special education student, contend that Jonathan's rights have been violated under federal and state laws pertaining to the education of students with disabilities. The defendants are the Caddo Parish School Board ("CPSB") and Dr. Terry Terril, in his official capacity as Superintendent of CPSB. The case is before the Court for the purpose of judicial review of administrative proceedings and for consideration, based upon the evidence submitted by the parties (including the transcript of the administrative proceedings, depositions, written exhibits and stipulated facts), of whether plaintiffs are entitled to relief on any of the various theories of recovery urged in their Complaint. By consent of the parties, the matter has been referred to the undersigned Magistrate Judge for disposition.

### (I) FACTS

The events at issue occurred in 1990 and 1991, at which time Jonathan was fourteen years old and attending Youree Drive Middle School ("Youree") in Shreveport. In order to understand the factual background leading to the complex and troubling issues presented by this case, however, it is appropriate to review Jonathan's experiences in the public schools prior to 1990.

In 1986, at the age of eight, Jonathan was evaluated by CPSB regarding the possibility that he required special education services. He was attending Hillsdale Elementary School at the time. The primary reason that Jonathan was referred for evaluation was academic difficulty, particularly in reading and math. Behavior difficulties and temper control were also noted as problems. The evaluation concluded that Jonathan should be classified as learning disabled, and he was placed in CPSB's special education program.

In January of 1989, while enrolled as a fifth grader at Arthur Circle Elementary School, Jonathan was re-evaluated "because of concerns regarding behavioral difficulties and continued academic deficits." The evaluation concluded that Jonathan met the criteria for classification as "behavior disordered/emotionally disturbed," with a secondary exceptionality of learning disabled. He was therefore transferred to the Alexander Special School for the balance of the 1988/89 school year and the entire 1989/90 year. Only exceptional students attend Alexander.

Having made relatively good progress at Alexander, partial "mainstreaming" was desired and Jonathan began the 1990-91 school year in a "self-contained" special education class at Youree for students with behavior disorders. However, not all students in the class were classified as emotionally disturbed. In fact, very few of Jonathan's fellow students were classified as having such an exceptionality. At Youree, Jonathan had some interaction with students who were not part of the special education program, during physical education class and at lunch.

The characteristics of Jonathan's behavior disorder, as described in CPSB's 1989 evaluation, included inability to retain control of his temper, refusal to follow instructions, defiance of authority and poor interpersonal relationships. Unfortunately, this evaluation turned out to be an accurate forecast of the problems Jonathan experienced at Youree during the 1990-91 school year. During that

year, Jonathan was referred to the office of the assistant principal on thirty-one occasions for disciplinary incidents usually involving disrespect of his teachers, cursing and refusing to follow instructions. Between January and May, 1991, he received five disciplinary suspensions for a total of 22 days, for conduct ranging from running away from his teachers, leaving campus without authorization and, on one occasion, saying to his teacher that if he had a gun (which he did not), "I ought to put it to your head and pull the trigger."

By May, 1991, Youree administrators and teachers felt that they could not control Jonathan's conduct and desired that he not attend Youree the next school year. They did not, however, seek to have CPSB re-evaluate Jonathan's placement status and educational needs. Instead, they attempted to convince Jonathan's parents that Youree was not the appropriate setting for his education, and that he should transfer to the Bethune Elementary School Early Adolescent Program, a highly structured program for students with behavior disorders. In May, June and August, 1991, Youree administrators advised Jonathan's parents that he should enter the Bethune program, or, in any event, not return to Youree. In correspondence to Jonathan's parents dated June 5, 1991, Youree's principal flatly stated that the school's building and screening committee had decided "that Jonathan not be placed at Youree Drive in the 1991–92 school year."

Jonathan's mother, however, did not want him to attend Bethune, and declined Youree's strongly worded suggestions that he do so.[1] In August, Jonathan enrolled at Youree for the Fall semester of 1991, and for a time seemed to show some improvement. Then matters deteriorated. In September he threatened to hit a teacher's aide, and was told that he would be suspended if such conduct recurred. On October 9, he was suspended for four days after he lost his temper and yelled at his teachers. While serving this suspension, he received an additional five day suspension for incidents that occurred at a school sponsored football game, including cursing the assistant principal. This suspension was upheld at a CPSB disciplinary hearing conducted on October 29, 1991.

At the October 29 hearing, Youree again recommended that Jonathan be placed at "a more appropriate setting," and the disciplinary officer agreed. By this time, however, Mrs. G. was represented by counsel who advised CPSB that Jonathan's parents demanded a due process hearing under the applicable state and federal laws before any change in Jonathan's placement was made. Plaintiffs also indicated that they would invoke certain statutory protections, further discussed below, which would preclude CPSB from changing Jonathan's placement pending the outcome of any administrative and judicial proceedings pertaining to the proposed transfer. Jonathan thus returned to Youree after serving his suspension, but not for long. On November 12, 1991, CPSB instituted a civil action in this Court (91–cv–2420) and obtained a temporary restraining order authorizing Jonathan's temporary placement at Bethune, pending the outcome of these proceedings, on the ground that his presence at Youree constituted a threat of imminent harm to himself and others. By consent of the parties, the temporary restraining order was converted to a preliminary injunction on November 22, 1991. Jonathan thereafter began attending Bethune, where he showed some improvement but still experienced behavior problems.

## (II) ADMINISTRATIVE PROCEEDINGS

As Jonathan began attending Bethune, his parents sought relief under the two-tiered administrative remedy system provided by Louisiana law for disputes involving special education students. Their objections to CPSB's actions with respect to Jonathan were first initially presented to a hearing officer in January, 1992. At that time, an extensive record was developed that included the testimony of Mrs. G., administrators and teachers from Youree and Bethune, expert

---

1. Jonathan's father was not actively involved in communications with Youree regarding Jonathan's placement.

witnesses and other involved parties. Plaintiffs' contentions at the administrative hearing fell into two major categories: (1) that while at Youree, CPSB had disciplined Jonathan for conduct related to his behavior disorder, in violation of federal and state law, and (2) that CPSB had failed to follow the applicable statutory notice and procedural requirements before changing Jonathan's educational placement.

Based upon the evidence presented, the hearing officer found that CPSB had improperly transferred Jonathan to Bethune without following the notice and re-evaluation procedures required by the applicable statutes and state regulations. The hearing officer also determined that the disciplinary suspensions which occurred subsequent to May, 1991 involved conduct related to Jonathan's disability and thus were inappropriate. Accordingly, the hearing officer ordered CPSB to provide "compensatory education" to Jonathan for the days which he was suspended, and ordered that CPSB immediately review and revise its individualized program for Jonathan's education. Finally, the hearing officer issued broad orders to CPSB requiring revision of certain procedures, in particular disciplinary procedures employed for special education students.

A three member state level review panel reversed the hearing officer's findings and concluded that (1) Jonathan was not disciplined for conduct related to his behavior disorder; (2) CPSB complied with all pertinent notice and procedural requirements; and (3) the hearing officer lacked authority to change or modify CPSB's special education and disciplinary procedures, and was instead limited to findings of fact in the case before him. Plaintiffs thereafter sought judicial review from this Court.

## (III) OVERVIEW OF APPLICABLE STATUTES

### (A) INDIVIDUALS WITH DISABILITIES EDUCATION ACT

#### (1) The Guarantee of a "Free Appropriate Education"

Many of the issues presented by this case arise under 20 U.S.C. § 1400, et seq., the Individuals with Disabilities Education Act (IDEA). This statute was enacted "to address a long history of discrimination by public schools against disabled children." *Teague Independent School Dist. v. Todd,* 999 F.2d 127, 129 n. 4 (5th Cir.1993). As a condition of federal funding, IDEA requires that states provide all children with a "free appropriate education," 20 U.S.C. § 1412(1), which the United States Supreme Court has defined as an education from which the child receives some degree of benefit. *Board of Education of Hendricks Hudson Central School District v. Rowley,* 458 U.S. 176, 200, 102 S.Ct. 3034, 3047, 73 L.Ed.2d 690 (1982).

A fundamental requirement of IDEA is that, to the maximum extent possible, children with disabilities be educated in the least restrictive environment consistent with their needs. The statute seeks to insure that children with disabilities will receive "not only freedom from restraint, but the freedom ... to associate with his or her family and able bodied peers," a concept known as "mainstreaming." *Sherri A.D. v. Kirby,* 975 F.2d 193, 207 n. 23 (5th Cir.1992).

#### (2) The Individualized Education Program

The principal tool of mainstreaming is the individualized education program (IEP). This is the vehicle by which schools are required to tailor the education of children with disabilities to their unique needs. 20 U.S.C. § 1401(a)(20). Among other requirements, an IEP must be written, must contain a statement of the child's present educational performance levels, a statement of annual goals, a statement of specific educational services to be provided, and appropriate objective criteria and evaluation procedures and schedules for determining, at least annually, whether instructional objectives are being met. *Id.*

Louisiana has adopted implementing statutes to assure that the state's educational programs comply with IDEA. La.R.S. 17:1945(A) requires that "an evaluation by a multidisciplinary team ... must be conducted before any action is taken with respect to initial placement or denial of placement of an

exceptional child." A reevaluation by a multidisciplinary team must be made "every three years or more frequently if conditions warrant it." *Id.* § 1945(c). Implementing regulations issued by the Louisiana Department of Education and contained in Bulletin 1706 further provide that within thirty days of an exceptional child's initial evaluation, there shall be an initial meeting between the child's teacher, at least one other representative of the school system and one or more of the child's parents for the purposes of developing an IEP and determining educational placement. The IEP placement determination must thereafter be updated on no less than an annual basis. Bulletin 1706, §§ 440–443, 445. Regulation § 458 further requires that any change in educational placement which involves "moving a child from one alternative setting to another which is more restrictive ... requires a reevaluation."

### (3) *Procedural Due Process*

IDEA also requires that participating states adopt procedural safeguards which provide the parents of the exceptional child with an opportunity to participate in the formulation and revision of the IEP, as well as written notice of any proposal "to initiate or change ... the identification, evaluation or educational placement of the child or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(1)(C). Any parent who objects to such a proposal has a right to "an impartial due process hearing" before the state or local educational agency (as determined by state law). The party aggrieved by the outcome of the administrative hearing process may bring a civil action in any state court of competent jurisdiction or in a district court of the United States. *Id.,* § 1415(b) & (e).

■ The "stay put" clause of § 1415(e)(3) provides that during the pendency of administrative proceedings or judicial review, "the child shall remain in the then current educational placement." While this provision precludes a school system from making a change in placement while due process proceedings are pending, it does not preclude the courts from authorizing such a change.

*Sherri A.D. v. Kirby, supra,* 975 F.2d at 205–06.

### (B) OTHER FEDERAL STATUTES

Plaintiffs also seek relief pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits discrimination against individuals with disabilities under any program receiving federal funding. This statute is broader in scope than IDEA, as it applies not only to the area of education, but to any program which receives federal funding.

■ CPSB questions whether IDEA supersedes plaintiffs' right to assert a claim under Section 504. Clearly it does not. 20 U.S.C. § 1415(f), added to IDEA by Congress through a 1986 amendment, provides that "[n]othing in this chapter shall be construed to limit the rights, procedures and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [29 U.S.C. § 790 et seq.], or other Federal statutes protecting the rights of children and youth with disabilities...."

■ The 1986 amendment plainly supersedes prior jurisprudence which held that a plaintiff entitled to relief under IDEA could not bring suit under Section 504, including *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). *See Fontenot v. Louisiana Board of Elementary and Secondary Education,* 805 F.2d 1222, 1223 (5th Cir. 1986). Therefore, plaintiffs are entitled to assert claims under Section 504 in addition to their claims under IDEA. Having exhausted their administrative remedies under IDEA, plaintiffs are not required to pursue additional administrative remedies before filing suit under Section 504. *Carey on Behalf of Carey v. Maine School Administrative Dst. No. 17,* 754 F.Supp. 906 (D.Me.1990); *Allstate Ins. Co. v. Bethlehem Area School District,* 678 F.Supp. 1132 (E.D.Pa.1987). Further discussion of the requirements for stating a cause of action under Section 504 and the remedies which are (and are not) available under that statute is contained in the section of this Memorandum Ruling that addresses plaintiffs' claim that their son was disciplined for conduct related to his behavior disorder, Section IV(B)(2), *infra.*

■ Finally, plaintiffs claim that they are entitled to relief under 42 U.S.C. § 1983. While IDEA now specifically preserves a plaintiff's right to combine claims brought under Section 504 with claims arising under IDEA, it does not specifically reference 42 U.S.C. § 1983. However, Section 1414(f) of IDEA generally preserves an injured party's right to separately assert a claim under the Constitution and "other Federal statutes protecting the rights of children and youth with disabilities." This language supports the proposition that a plaintiff alleging violations under IDEA may also seek relief under Section 1983, even though the Fifth Circuit held to the contrary, prior to the adoption of the 1986 amendment, in *Marvin H. v. Austin Independent School District,* 714 F.2d 1348 (5th Cir.1983). Considering the wording of the 1986 amendment, the Court concludes that plaintiffs are not precluded from asserting claims under 42 U.S.C. § 1983.[2]

Having determined that plaintiffs have the right to seek relief under IDEA, Section 504 the Rehabilitation Act and Section 1983, it is now appropriate to evaluate those claims in light of the evidence presented.

## (IV) APPLICATION OF LAW TO FACTS

### (A) STANDARD OF REVIEW

As to plaintiffs' claims under IDEA, 20 U.S.C. § 1415(e)(2) provides that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on a preponderance of the evidence, shall grant such relief . . . as is appropriate." The Fifth Circuit has determined that this provision contemplates that the district court's review of the administrative proceedings will be "virtually *de novo.*" *Teague Independent School Dist. v. Todd L., supra,*

999 F.2d at 131. The hearing officer's findings are to be given due weight, but "the statute does not state that the district court must defer to those findings when its own review of the evidence indicates the hearing officer erroneously assessed the facts or erroneously applied the law to the facts." *Id.* In accordance with this standard, this Court has conducted *de novo* review of the record for the purposes of assessing plaintiffs' claims under IDEA.[3]

■ Although review is *de novo,* "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Board of Education v. Rowley, supra,* 458 U.S. at 207, 102 S.Ct. at 3051. Courts lack the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy." *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). Given these practical restrictions on a reviewing court's expertise, the Court is cognizant that the close scrutiny warranted by *de novo* review should be tempered by the realization that decisions made by those "in the trenches" of educational service should not be casually disregarded.

The same evidence upon which plaintiffs rely for their claims under IDEA provides the basis of their claims under Section 504 and Section 1983. In evaluating those claims, the Court will consider whether the preponderance of the evidence supports plaintiffs' claims under those statutes.

### (B) ALLEGED VIOLATIONS OF SUBSTANTIVE LAW

#### (1) *Disciplinary Suspensions*

Plaintiffs allege that Jonathan's disciplinary suspensions at Youree involved conduct

---

**2.** The issue of whether an action arising under IDEA is separately cognizable under § 1983 may be of little practical consequence in this case. While § 1983's potential application to similar cases was of great significance when IDEA did not permit the prevailing party to recover attorney's fees, *see Marvin H., supra,* IDEA now has its own provisions for an award of attorney's fees to the prevailing party, 20 U.S.C. § 1415(e)(4)(B), as does the Rehabilitation Act, 29 U.S.C. § 794a(b), and at least in this case, which does not involve the assertion of damage

claims against defendants sued in their individual capacities, the substantive remedies available under § 1983 are also available under the other statutes.

**3.** The record before the Court is mainly comprised of the testimony and written exhibits offered into evidence at the administrative hearing, as well as a post-hearing deposition and affidavits submitted by agreement of the parties.

related to his behavior disorder, and therefore were imposed in violation of IDEA and Section 504 of the Rehabilitation Act. Resolution of this issue first requires careful consideration of the evidence presented regarding Jonathan's behavior disorder and whether it related to the conduct for which he was suspended. Because the Court answers the latter question in the affirmative, the second matter to be addressed is the remedies (if any) to which plaintiffs are entitled under the two aforesaid statutes in light of the particular facts of this case.

### (a) *Alleged Relationship Between Disciplinary Action and Exceptionality*

■ As previously discussed, Jonathan's initial evaluation, prepared in 1986, listed his primary exceptionality as learning disabled. Although there was no reference to any behavior disorder as an exceptionality at that time, the 1986 evaluation did refer to concerns over "Jonathan's low frustration level and temper control." It was in 1989 that Jonathan's evaluation was changed to reflect a primary exceptionality of "behavior disordered/emotionally disturbed." The 1986 multidisciplinary evaluation described his impairment as causing "severe social/emotional and behavioral difficulties," characterized by "lack of respect for authority, poor interpersonal relationships, poor impulse and anger control, a poor self concept, poor work habits, and a lack of academic motivation." Among other behavioral problems, the 1986 evaluation noted that Jonathan frequently spoke to his teachers in a discourteous manner and that he became angry quickly. He had received detentions for failing to comply with teacher requests and acting in a defiant manner. Diagnostic evaluations and test results referenced in the evaluation indicate that the types of conduct listed above were part of a behavioral disorder that CPSB considered an exceptionality. "He appears," the evaluation stated, "to have difficulty controlling his impulses and is unable to show his true abilities."

On first impression, CPSB's contention that the range of behaviors which led CPSB to suspend Jonathan from Youree on multiple occasions were not related to his exceptionality seems highly questionable. The very types of conduct described in the 1986 evaluation, including uncontrolled anger, defiance and disrespect of authority and refusal to obey superiors, were present in every instance of suspension. Indeed, the conduct for which he was suspended appears not only related to his exceptionality, but predictable in light of the conclusions reached in the evaluation. Nevertheless, because courts should not be quick to second-guess the decisions of educators, the Court has carefully considered the explanation offered by CPSB in support of its position on this issue.

On each occasion that Jonathan was suspended, a special committee of Youree administrators made a determination, duly noted on the appropriate Caddo Parish Special Services Disciplinary Information form, that Jonathan was being suspended for conduct unrelated to his exceptionality. This committee was normally comprised of Mr. Tabor, the assistant principal, Ms. Daniels or Mr. Gates, Jonathan's classroom teachers and Ms. Dominguez, school counselor.

While under cross examination, Ms. Dominguez explained as follows her reasons for concluding that Jonathan was not suspended for conduct relating to his exceptionality:

Q. In these seven determinations, can you explain why the decision was made that what this behavior consisted of was not related to the types of behaviors identified in his evaluation?

A. I think over all it was the seriousness of each one. When it said lack of respect for authority in his evaluation, the intensity that he demonstrated to Mr. Tabor was what was causing us to say that it was not related to his exceptionality, the intensity of—the seriousness of his actions.

Q. Was it intense to the extent that he was out of control?

A. It was.

Q. And would that not necessarily flow from a person who has a difficulty controlling anger and controlling angry impulses?

A. It does, but it was again—the difficulty was beyond what was stated in his evaluation.

. . . . .

Q. And what did you attribute the behaviors that were so extreme to? To what cause might one attribute these behaviors to?

A. I don't know what the reason for his behavior was, other than—I don't know. I can't say what they would be attributed to. (Dominguez deposition, pp. 27–29).

Assistant principal Wayne Tabor testified that he considered Jonathan's refusal to obey the orders of his teachers, and the fact that he ran away from his teachers on certain occasions, to be unrelated to his exceptionality. With respect to such conduct, Mr. Tabor opined that Jonathan "was choosing to do what he was doing." T., Vol. II, p. 96. Mr. Tabor emphasized his belief that suspension was appropriate when Jonathan engaged in behavior which placed himself or others at risk, and refused to submit to authority.

Carol Jenkins, school psychologist, testified that "Jonathan knows right from wrong," and that when he engaged in physical aggression or conduct dangerous to himself or others it was because "sometimes he doesn't care." *Id.*, pp. 175–76. However, Ms. Jenkins acknowledged that "[h]e has a difficulty controlling that behavior, and that is why it is important for a school to do everything within its power to mitigate what Jonathan does." *Id.*, pp. 176–77.

While there is no reason to question the sincerity of these witnesses, their conclusions are unpersuasive, particularly in light of CPSB's own 1986 evaluation of Jonathan's behavior disorder. The overall impression left by the testimony of these witnesses is their belief that whenever Jonathan's conduct reached the point that he (1) refused to submit to the authority of school teachers and officials, e.g., by running away his teachers or by leaving the school grounds; or (2) engaged in conduct threatening to himself or others, he was engaging in conduct of a "severity" that was "outside" his behavior disorder. Yet, as pointed out by Dr. Perry Hill, a psychologist called as an expert witness by the plaintiff, the conclusion that Jonathan's angry, defiant and aggressive conduct was not related to his behavior disorder is not supported by CPSB's 1986 multidisciplinary evaluation. That evaluation does not state or even imply that Jonathan's behavior disorder was limited to minor outbursts of temper or displays of aggression. Nor is there any logical reason to conclude that a student diagnosed by CPSB's own evaluation as suffering from severe problems of self-control "chose" to engage in conduct that "he knew was wrong" on those occasions when his lack of self control was most evident.

It is readily apparent that the teachers and administrators at Youree had serious concerns over their ability to control Jonathan's conduct and the possibility that he would injure himself or others. Those concerns seem more than justified. Nevertheless, it is also readily apparent that the repeated use of disciplinary suspensions in response to behavior had little impact as far as altering or improving Jonathan's conduct. The record also establishes that Youree administrators had adequate non-disciplinary options at their disposal in those situations where they concluded that Jonathan's behavior was a danger to himself or others. Those options included non-disciplinary "exclusion" from campus for brief periods and obtaining a re-evaluation of Jonathan's status for the purpose of determining whether he should be moved to a more restrictive educational environment. Instead, no re-evaluation was requested or undertaken in advance of the regularly scheduled re-evaluation completed December 11, 1991 (which recommended change in placement to Bethune).

CPSB presented convincing evidence at the administrative hearing in support of its contention that the Bethune program is better designed to address Jonathan's exceptionality and has the potential for helping him develop to the point that he could eventually return to a less structured educational setting such as Youree. Most significantly, CPSB has never contended that Jonathan should have been transferred to Bethune as a punishment, but asserts (also through convincing evidence) that the change was in Jonathan's best interests. While this evidence is beneficial to CPSB as to certain other issues raised in this litigation, it cuts squarely against the proposition that Jonathan's conduct at Youree was unrelated to his exceptionality. Most telling is the correspon-

dence to Jonathan's parents dated June 5, 1991, in which Youree's principal first listed Jonathan's numerous disciplinary incidents during the 1990–91 school year, and then concluded that "Youree cannot provide the structure needed to meet the needs of Jonathan's exceptionality."

For the foregoing reasons, the Court concludes that the plaintiff has proven by a preponderance of the evidence that Jonathan was suspended from Youree for conduct related to his behavior disorder.

### (b) *Remedy*

For the following reasons, the Court concludes that its finding that CPSB suspended Jonathan for reasons related to his disability entitles plaintiffs to a remedy under Section 504 of the Rehabilitation Act, but not under IDEA. Because, in this context, Section 504 is perhaps best understood as supplementing the procedural protections provided by IDEA, it is appropriate to discuss the latter statute first.

■ The protections afforded by IDEA are largely procedural in nature. In describing the congressional intent behind the Act, the Supreme Court has referred to "the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Board of Education v. Rowley, supra,* 458 U.S. at 206, 102 S.Ct. at 3050.

■ Clearly, if a state adopts a disciplinary procedure that does not comport with IDEA, the aggrieved party is entitled to relief under that statute. For example, before an exceptional child can be subjected to a "change in placement," his parents are entitled to a due process hearing. 20 U.S.C. § 1415. Expulsion is considered a "change in placement," which requires a due process hearing and "a determination as to whether the handicapped student's misconduct bears a relationship to his handicap." *S–1 v. Turlington,* 635 F.2d 342, 346 (5th Cir.), *cert. denied,* 454 U.S. 1030, 102 S.Ct. 566, 70

L.Ed.2d 473 (1981). *See also Kaelin v. Grubbs,* 682 F.2d 595 (6th Cir.1982); *Stuart v. Nappi,* 443 F.Supp. 1235 (D.Conn.1978). On the other hand, a temporary suspension from school is not a change in placement which triggers the requirement of a due process hearing under IDEA, *Kaelin v. Grubbs,* 682 F.2d at 602, and plaintiffs do not contend to the contrary.

■ Instead, plaintiffs seek substantive review of CPSB's disciplinary suspensions and the issue is whether IDEA provides a cause of action (and thus a remedy) for such a claim.[4] The jurisprudence demonstrates that there are two types of civil actions that arise under IDEA. First, the statute specifically provides that an aggrieved party may seek judicial review of any determinations which require a due process hearing. Second, if the state refuses to hold such a hearing when required, or otherwise fails to adopt procedures which satisfy the minimum requirements of the statute, the injured party may bring an action to enforce the procedural requirements. Plaintiff's request for review of CPSB's substantive determinations regarding Jonathan's suspensions does not fit into either category. IDEA does not authorize courts to conduct substantive review of a disciplinary determination by the school board that does not constitute a change in placement or otherwise trigger the requirement of a due process hearing under § 1415.

The inapplicability of IDEA to this substantive issue, however, does not leave the plaintiffs without a remedy. Plaintiffs also assert a claim pursuant to § 504 of the Rehabilitation Act, which provides in pertinent part that:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. ...

■ The Court of Appeals, Fifth Circuit has held that a cause of action is stated

---

**4.** Plaintiffs also attack the procedure employed by CPSB for imposing discipline on special education students, an issue considered separately in Section (IV)(C)(1), *infra.*

under Section 504 "when it is alleged that a school district has **refused** to provide reasonable accommodations for the handicapped plaintiff to receive the full benefits of the school program." *Marvin H. v. Austin Independent School Dist.*, *supra*, 714 F.2d at 1356 (emphasis by the Court); *Tatro v. State of Texas*, 703 F.2d 823, 832 (5th Cir.1983) (*Tratro II* ). Jonathan's multiple suspensions from Youree, during which time he was not provided the benefit of any educational services, violated Section 504 because they restricted his educational opportunities for reasons related to his disability. In a very real sense and for purposes of Section 504, CPSB "excluded" Jonathan from access to its educational system during the period of the suspensions for reasons related to his disability.

The scope of the remedy available under Section 504 depends upon whether the defendants intentionally violated the plaintiffs' rights under the statute. In *Marvin H.*, the Fifth Circuit observed that the remedies for a violation of Section 504 are those remedies provided for in Title VII of the Civil Rights Act of 1964, which provides for an award of damages only upon a showing of intentional discrimination. 714 F.2d at 1356–57. Finding it to be conceded that the defendants "were sincerely trying to perform their jobs and sincerely attempting to follow state and federal guidelines," the Court of Appeals held that there was no intentional discrimination, and that accordingly the plaintiffs could not recover damages.

The Court of Appeals, Eighth Circuit has held that in the context of special education services, the plaintiff alleging a violation of Section 504 must show "bad faith or gross misjudgment." *Monahan v. State of Nebraska*, 687 F.2d 1164, 1171 (8th Cir.1982). In reaching this result, the Court of Appeals reasoned that:

> Manifestly, in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide the free appropriate education required by EAHCA [now IDEA] must be shown. The reference in the Rehabilitation Act to "discrimination" must require, we think, something more than an incorrect evaluation, or

a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often an arguable matter. That a court may, after hearing argument and evidence, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under EAHCA, is not necessarily the same thing as holding that a handicapped child has been discriminated against solely by reason of his or her handicap. An evaluation, in other words, is not discriminatory merely because a court would have evaluated the child differently.

> We do not read § 504 as creating general tort liability for educational malpractice.... We think, rather, that either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children.... So long as the state officials involved have exercised professional judgment, in such a way as to not depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504.

687 F.2d at 1170–71.

The Fifth Circuit has not gone so far as to hold that in order to state a cause of action under Section 504, it must be shown that the defendant acted in bad faith. *Marvin H.* indicates that injunctive or declaratory relief could be obtained in order to remedy an ongoing violation without a showing of intentional discrimination. However, the language used by the Eighth Circuit in *Monahan* is nevertheless useful in assessing whether the defendants engaged in an intentional refusal of services sufficient to allow an award of damages.

■ The record does not support the conclusion that the CPSB personnel involved in the decisions to suspend Jonathan acted in bad faith or pursuant to a gross misjudgment. Confronted with a difficult situation and acting pursuant to what they perceived as the best interests of both Jonathan and the entire student body at Youree, the CPSB

employees suspended Jonathan on those occasions when he seemed a threat to the safety of himself or others. While a different course of action should have been pursued (namely, re-evaluation and, when necessary, non-disciplinary exclusion) the Court does not believe that Jonathan was the victim of intentional discrimination. Plaintiff is not entitled to monetary damages, in the form of compensatory education benefits or otherwise, as the result of the defendant's violation of Section 504.[5]

Plaintiffs are, however, entitled to a declaratory judgment recognizing that Jonathan was suspended for conduct related to his disability, and ordering the records of his disciplinary suspensions expunged. Declaratory and equitable relief of this nature is clearly available under Title VII, and accordingly may be awarded for a violation of Section 504.

### (2) *Alleged Failure to Provide Appropriate Individual Education Program*

Plaintiffs also contend that both before and after Jonathan's transfer to Bethune, CPSB failed to provide an appropriate education program tailored to Jonathan's individual needs as an exceptional student. Substantive judicial review on this issue is clearly contemplated by IDEA, which permits review of any administrative ruling pertaining to any proposal to change (or refusal to change) the child's evaluation and placement. The proper inquiry is whether "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Rowley, supra,* 458 U.S. at 207, 102 S.Ct. at 3051. Ordinarily, a presumption exists in favor of the local public school district's plan for educating the child, provided it comports with IDEA. *Teague Independent School District v. Todd L., supra,* 999 F.2d at 132; *Tatro II, supra,* 703 F.2d 823, 830. Because of the determination made in Section IV of this Memorandum Ruling that CPSB violated certain procedural requirements imposed by IDEA and perti-

nent state regulations, no such presumption has been applied in this case.

Jonathan's mother testified of her belief that her son's individual needs were not being met at Youree, and that he was being "shuffled off" to an "unhealthy environment" at Bethune. Her testimony was short on specifics as to the steps that she believed CPSB should have taken to improve Jonathan's IEP and as to why she believed that Youree better served Jonathan's educational interests than did Bethune. Dr. Hill, plaintiff's expert, testified that Jonathan's educational needs would not be met by using discipline and imposition of adverse consequences as the primary means of teaching Jonathan to overcome problems associated with his behavior disorder, and that Jonathan's IEP should instead focus upon teaching him alternative methods of responding to stressful situations. T., Vol I, p. 141. Dr. Hill emphasized a need for a system of rewards when Jonathan shows improvement, because "[c]onsequences alone will not do the trick." *Id.,* p. 178.

Yet there appears to be a strong similarity between the type of individualized education plan advocated by Dr. Hill and the Early Adolescent Program at Bethune, as described during the testimony of Tracy Ammons, a CPSB instructional specialist for emotionally disturbed students, and Monica Barbee, an instructor at Bethune. The program is divided into three levels and students advance from level to level according to their individual progress. Each student receives a significant amount of individual attention and counselling, and the instructors have extensive training in the handling of students with behavior disorders. Successful completion of the program, encouraged through a system of incentives and rewards, allows the student to return to a less structured classroom environment. The record also reflects that on occasions when Jonathan exhibited conduct at Bethune similar to the conduct which resulted in disciplinary suspensions while he was at Youree, he was excluded from partic-

---

**5.** The issue of whether plaintiff is entitled to recover attorney's fees is addressed in Section V, *infra.*

ipation in the program for brief periods, but not subjected to disciplinary action.

■ Dr. Hill expressed doubts over whether the Bethune program would adequately meet Jonathan's individual education needs, but he was forced to qualify those doubts by admitting that his familiarity with the Bethune program was quite limited. Plaintiffs complain in brief that rather than providing Jonathan with an individualized education plan, CPSB is forcing him to conform to a non-individualized program. Having reviewed both the re-evaluation and IEP completed in 1989 and the testimony regarding the manner in which the Bethune program works in practice, the Court does not find plaintiffs' argument that Jonathan is not currently receiving an appropriate individualized education to be supported by the preponderance of the evidence.

Nor does the fact that Jonathan ultimately was unable to adjust to his environment at Youree mean that CPSB failed to provide an appropriate individual education program for Jonathan prior to his transfer to Bethune. Earlier IEPs clearly set forth an individualized plan for Jonathan's education that included specific recommendations for addressing his exceptionality. As the 1990–91 school year progressed, it became apparent that a re-evaluation of Jonathan's educational needs was becoming necessary, and, given Jonathan's ongoing behavioral problems, a re-evaluation could and should have been completed sooner than November, 1991, probably prior to the commencement of the school year in the Fall of 1991.

■ Nevertheless, to declare that a child has been denied a free appropriate education on every occasion that it appears, with the benefit of hindsight, that school officials should have responded more promptly to a child's educational needs would hold school boards to an unrealistic if not impossible standard. IDEA contemplates that a child receive "some benefit" from his or her placement and IEP, but "not necessarily maximization of his potential." *Teague Independent School Dist. v. Todd L., supra,* 999 F.2d at 132. The state must provide "personalized instruction with sufficient support services to permit the child to benefit edu-cationally from that instruction." *Rowley, supra,* 458 U.S. at 203, 102 S.Ct. at 3049. Despite the delay in Jonathan's re-evaluation, the Court cannot conclude that he received no educational benefit while at Youree. Indeed, Jonathan's parents resisted all CPSB efforts to accomplish a change in his placement. The record also reflects that Jonathan's teachers at Youree made their best efforts to assist Jonathan with his educational needs and to provide him with an appropriate amount of individual counselling and instruction. And at certain points, the cooperation of Jonathan's parents with the efforts made by Youree administrators was limited. Considering all of these factors, the preponderance of the evidence demonstrates that Jonathan was provided with free appropriate education and an adequate individual education program while he attended Youree.

Based upon his apparent conclusion to the contrary, the hearing officer ordered that "Caddo update the recent evaluation if necessary, and that an IEP meeting be held to develop an appropriate program for Jonathan ... within 45 days." For the reasons stated above, this Court concludes, as did the State Level Review Board, that such relief is not warranted.

## (C) ALLEGED VIOLATIONS OF PROCEDURAL LAW

### (1) *Disciplinary Procedures*

Plaintiffs contend that CPSB's disciplinary procedures violated Jonathan's civil rights and entitle him to relief pursuant to 42 U.S.C. § 1983. Since the defendants in this lawsuit are CPSB and individuals sued in their official capacity, the plaintiffs cannot prevail under § 1983 unless they establish discrimination resulting from what may fairly be characterized as the official policy of the school board. *Monell v. City of New York, Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Plaintiffs acknowledge in brief that "[t]he question under a Section 1983 analysis is not whether the specific disciplinary actions imposed on Jonathan violated his rights under IDEA, but whether the system, policy and practices of imposing discipline upon stu-

dents with disabilities evidence a disregard for the IDEA's substantive and procedural rights." Plaintiffs' Memorandum of Law, pp. 44–45.

The record does not support the proposition that CPSB's policies for imposing discipline upon special education students are discriminatory. CPSB follows the procedures outlined in § 459 of Bulletin 1706, including the requirement that "[p]rior to the suspension or expulsion of a student classified as handicapped a determination must be made ... as to whether the behavior is related to the student's handicapping condition." These regulations provide that this determination "must be made by at least one person knowledgeable about the student (e.g., a teacher) and one other professional staff member of the school system knowledgeable about the handicapping condition of concern (e.g., a certified special education teacher, a pupil appraisal staff member)." CPSB not only followed that procedure on all occasions when Jonathan was suspended, but often had three persons participating in the relatedness determination. The regulations also provide that the special education administrator be notified within one operational day of any disciplinary determination involving a special education student, and that an IEP conference be held after the third suspension has occurred. These policies were followed in this case.

■ Plaintiffs complain that the relatedness determinations were flawed because of participation in the same by school personnel with insufficient training in special education, such as Mr. Tabor, the assistant principal. Yet the record establishes that a special education counselor participated in the relatedness determinations, as required by state regulations. The law does not otherwise preclude teachers or administrators familiar with the student from participating in the relatedness determination.

■ Plaintiffs also contend that Youree officials essentially made the decision to "suspend first" and to make a relatedness determination later, merely in order to assure formal compliance with the law. This argument might be persuasive if a sole teacher or administrator had routinely made the unilateral determination that Jonathan's conduct was unrelated to his disability, but that did not happen in this case. Not only the assistant principal but also Jonathan's teachers and CPSB special education personnel repeatedly made the determination that his conduct was unrelated to his disability. While the Court believes that those individuals erred by assuming that Jonathan's conduct was unrelated to his disability once it reached a certain extreme, it does not believe the relatedness determinations were made in bad faith, or simply as a means of "rubber stamping" the decision of the assistant principal. More pertinent for the purposes of a claim against the school board under § 1983, which does not turn upon the motives of the individuals concerned, the regulations and policies of CPSB do not promote cursory or perfunctory relatedness determinations.

While the Court rejects CPSB's contention that Jonathan's conduct was not related to his exceptionality, it cannot agree that the policies and procedures employed by CPSB for the relatedness determination are inherently discriminatory. Accordingly, plaintiffs are not entitled to relief under 42 U.S.C. § 1983.

#### (2) *Regulation 458*

Plaintiffs contend that CPSB improperly attempted to accomplish Jonathan's transfer from Youree to Bethune without first requiring a re-evaluation of his status by a multidisciplinary team, as required Regulation 458 of Bulletin 1706 whenever a child is moved "from one setting to another which is more restrictive...." CPSB's response is that Bethune is not a more restrictive setting than Youree, because Jonathan was in a self-contained class comprised solely of special education students while at both schools.

Although the parties devote much attention to this issue in brief, the great weight of the evidence shows that the Bethune Early Adolescent Program is a more restrictive setting than the special education program at Youree. At Youree, Jonathan had some interaction with non-special education students (at lunch, assemblies and during physical education). At Bethune, at least while in the first level of the program, he had none.

Also, the very reasons cited by CPSB as justifying Jonathan's transfer, including the highly structured and supervised nature of the program at Bethune, demonstrate that Bethune is a more restrictive environment. Under the state's own implementing regulations, a re-evaluation normally should have been completed prior to the transfer.

It therefore would have been proper procedure for CPSB to order a re-evaluation in May, 1991 (by which time Youree administrators had clearly determined that placement at Bethune was appropriate). If as a result of the re-evaluation a change in placement had been proposed, Jonathan's parents, upon receiving appropriate notice, would have had the option of requesting a due process hearing. Instead of proceeding in this fashion, CPSB first attempted to obtain parental consent to the transfer by scheduling an IEP meeting to discuss the same in May, 1991. After Jonathan's mother indicated her disapproval of a transfer, Youree's screening committee forwarded correspondence to Jonathan's parents on June 5, 1991 stating that the committee had decided that "Jonathan not be placed at Youree Drive in the 1991–92 school year." Under Department of Education regulations, however, the Committee did not have the authority to make such a decision on its own. Perhaps in recognition of this fact, CPSB allowed Jonathan to return to Youree at the start in the Fall of 1991, although not before Youree held a placement review meeting on August 21, 1991 and again recommended that Jonathan be placed at Bethune. Finally, on October 21, 1991, at the conclusion of a disciplinary hearing pertaining to Jonathan's last suspension, Youree administrators again recommended change in placement.

Nevertheless, despite attempts to persuade the parents to accept a change to a more restrictive environment in a manner not consistent with either the spirit or letter of the state regulations, CPSB did not actually effectuate the change in placement until November 11, 1991, when it obtained a temporary restraining order from this Court (per Judge Politz) enjoining Jonathan from attending Youree during the pendency of these proceedings and directing that Jonathan be temporarily placed at Bethune. The temporary restraining order, thereafter made a preliminary injunction by the consent of the parties, was obtained upon CPSB's showing that Jonathan's continued presence at Youree posed a severe threat of imminent danger to himself or others. *See Honig v. Doe*, 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988).

After the injunction was in place, CPSB completed a re-evaluation that supported the change in placement and revised Jonathan's IEP. Plaintiffs were then afforded a due process hearing (albeit after the change in placement due to the injunction) at which time, as previously noted, CPSB provided convincing support for its placement determination.

 While the Court agrees with plaintiffs that CPSB violated Regulation § 458 by not ordering a re-evaluation in connection with the proposed change to a more restrictive environment, that violation became a moot point due to a combination of three factors: (1) exigent circumstances required the issuance of the injunction and Jonathan's interim placement at Bethune; (2) a re-evaluation was subsequently completed; and (3) CPSB proved by a preponderance of the evidence at the due process hearing that the change in placement was in Jonathan's best interests. Under these unique circumstances, CPSB's failure to adhere to the requirements of § 458 did not cause injury to Jonathan or impede his right to receive a free appropriate education.

*(3) 20 U.S.C. § 1415*

 Plaintiffs also argue that Jonathan's transfer from Youree to Bethune constituted a change in "educational placement" under IDEA, 20 U.S.C. § 1415, such that CPSB was required to advise plaintiffs of their right to a due process hearing prior to the transfer. A mere transfer from one school to another is not necessarily a change in educational placement for the purposes of this statute. *Weil v. Board of Elementary and Secondary Education*, 931 F.2d 1069 (5th Cir.1991). "An educational placement ... is not changed unless a fundamental change in, or elimination of, a basic element

of the educational program has occurred." *Sherri A.D. v. Kirby,* 975 F.2d 193, 207 (5th Cir.1992). For much the same reasons used in determining that Bethune is a more restrictive environment than Youree, the Court agrees that the move from Youree to Bethune was a change in educational placement that required CPSB to advise the plaintiffs of their right to a due process hearing under 20 U.S.C. § 1415.

Although the parents ultimately learned of their rights in that regard after they retained counsel, they were not so advised on the multiple occasions when CPSB proposed a change in placement in the Spring and Fall of 1991. As discussed in connection with plaintiffs' claim under § 458 of the state regulations, however, the superseding effect of the injunction entitled CPSB to change Jonathan's placement prior to the due process hearing, and the fact that such a due process hearing was held subsequently renders the matter moot.

### (4) *Impact of Procedural Violations*

■ Plaintiffs also argue that significant violations of IDEA's procedural requirements had the cumulative effect depriving Jonathan of a free appropriate education. As a general rule, the proposition that serious procedural violations can result in such a deprivation is undoubtedly correct. *See Board of Education v. Rowley, supra,* 458 U.S. at 204–06, 102 S.Ct. at 3050 (emphasizing importance of procedural compliance). Nevertheless, the procedural violations which occurred in this case did not alter either the quality of Jonathan's education or the ultimate placement decision. As the Supreme Court observed in *Rowley,* one of the main purposes of IDEA's procedural requirements is to insure parental participation in the formulation of the IEP and any placement decision, and even though proper procedures were not always followed, Jonathan's parents were afforded the opportunity for full participation in those matters. Jonathan thus was not denied a free appropriate education because of any of the procedural irregularities heretofore discussed.

### (V) ATTORNEY'S FEES

Plaintiffs have prevailed in their claim under the Rehabilitation Act by establishing that Jonathan was subjected to disciplinary suspensions for reasons related to his disability. Their claim for compensatory relief is rejected, but they are entitled to declaratory relief. Plaintiffs have established procedural violations of IDEA, although under the facts presented those violations do not entitle them to affirmative relief. Plaintiffs' substantive claim for relief under IDEA regarding the adequacy of Jonathan's IEP has been denied. Finally, plaintiffs claims under § 1983 have been rejected.

■ Under these circumstances, the plaintiffs are "prevailing parties" for the purposes of the Rehabilitation Act, and are entitled to recover attorney's fees pursuant to 29 U.S.C. § 794a(b). Because plaintiffs have not established a right to affirmative relief under IDEA, they are not prevailing parties for the purposes of the attorney's fees provision of that statute, 20 U.S.C. § 1415(e)(4)(B). Accordingly, the Court concludes that plaintiffs are entitled to an award of attorney's fees and costs limited to the prosecution of their claim that CPSB improperly imposed disciplinary suspensions upon Jonathan for reasons related to his exceptionality. Because plaintiffs could not file suit on this claim without first exhausting their administrative remedies under IDEA, the fee award should include attorney time and expenses incurred with respect to that issue during the administrative hearing process.

By separate order, the Court will schedule such further proceedings as may be necessary to determine the amount of the attorney's fees award.

ACCORDINGLY, and as set forth in the separate judgment issued this date, there will be judgment in favor of plaintiffs under Section 504 of the Rehabilitation Act, declaring that defendants improperly suspended Jonathan G. from Youree Drive Middle School for reasons related to his exceptionality and directing that all disciplinary records pertaining to all such suspensions in 1990 and 1991 be expunged; there will be judgment in favor of defendants as to all claims

asserted by the plaintiffs under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*, and as to all claims asserted under 42 U.S.C. § 1983; and there will be judgment in favor of plaintiffs and against defendants for reasonable attorney's fees and costs incurred in prosecution of their claim under Section 504 of the Rehabilitation Act, the amount of said award to be determined pursuant to further proceedings of this Court. Plaintiffs are ordered to file a motion to fix attorney's fees, together with an itemized affidavit of the time and expense incurred, within 30 days.

### JUDGMENT

For the reasons stated in the Memorandum Ruling issued this date:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that there is judgment in favor of plaintiffs under Section 504 of the Rehabilitation Act, declaring that defendants improperly suspended Jonathan G. from Youree Drive Middle School for reasons related to his exceptionality and directing that all disciplinary records pertaining to all such suspensions in 1990 and 1991 be expunged; that there is judgment in favor of defendants as to all claims asserted by the plaintiffs under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*, and as to all claims asserted under 42 U.S.C. § 1983; and that there is judgment in favor of plaintiff and against defendants for reasonable attorney's fees and costs incurred in prosecution of their claim under Section 504 of the Rehabilitation Act, the amount of said award to be determined pursuant to further proceedings of this Court.