**MARVIN H., Kaye H. and Bryan H.,**
**Plaintiffs-Appellants,**

v.

**AUSTIN INDEPENDENT SCHOOL DIS-**
**TRICT, et al., Defendants-Appellees.**

No. 82–1514.

United States Court of Appeals,
Fifth Circuit.

Sept. 22, 1983.

James C. Todd, Advocacy, Inc., Austin, Tex., for plaintiffs-appellants.

McGinnis, Lochridge & Kilgore, William H. Bingham, Jr., James R. Raup, Austin, Tex., for defendants-appellees.

Before RUBIN and JOLLY, Circuit Judges, and PUTNAM *, District Judge.

E. GRADY JOLLY, Circuit Judge:

Plaintiffs Marvin and Kaye H., on behalf of their fourteen-year-old son Bryan H., filed suit against the Austin Independent School District (AISD) and various school officials, alleging that Bryan was an emotionally disturbed child, that the school district failed to identify Bryan as a handicapped child and thus had denied him a free appropriate education in violation of the Education for All Handicapped Children Act (20 U.S.C. §§ 1401–1461) (EAHCA), section 504 of the Rehabilitation Act (29 U.S.C. § 794) (section 504) and 42 U.S.C. § 1983. They sought a declaratory judgment that the defendants had discriminated against Bryan on the basis of handicap, restitution for certain expenses incurred by the parents' unilateral resort to private counseling and private schooling, and actual, compensatory and punitive damages of $150,000.[1] The district court granted summary judgment for the defendants. The plaintiffs have filed a timely appeal, claiming that there remain genuine issues of material fact and that they have a cause of action for monetary restitution and damages as a matter of law.

The issue before this court is thus whether under any of the cited statutes the parents of a handicapped child may recover either retrospective compensation for private services unilaterally procured by the

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. The plaintiffs also sought an injunction requiring the defendants to place Bryan in an appropriate residential educational program. That request was later withdrawn when the parents moved from Austin and placed Bryan in another school district.

parents or damages for failure of the school district to provide these services when the school district has attempted in good faith to adhere to federal and state guidelines. We think not and affirm the grant of summary judgment.

## I.

Bryan H.'s problems in school began in March of 1979 when he was an eleven-year-old seventh grader at Dobie Junior High School within the AISD. He experienced a change in his conduct and personality which resulted in a temporary decline in his grades. His conduct regressed to the point that he was suspended from school for a day.˙ At home he began having temper tantrums, although this behavior did not emerge at school. The H. family was referred by the school officials to the Travis County Mental Health-Mental Retardation Center (MH–MR) for counseling. Bryan attended six such counseling sessions but rejected further counseling. We note that in response to a promise that he could have a dirt bike if he improved his grades, he attended classes regularly in May of 1979, passed five of his seven courses, and was promoted to the eighth grade.

In the fall of 1979, after a good start, he once again regressed and was suspended for using inappropriate language to a secretary and failing to turn over his snuff can to a teacher. School officials referred the family to the School Community Guidance Center and to the W.R. Robbins School, both designed to aid problem truants become reinterested in school, but because Bryan expressed no interest in going, his mother cancelled the appointments. Rather, at the end of October, she took Bryan to a child psychiatrist, Dr. Matthews, who gave him an anti-depressant drug which apparently helped (until at some point Bryan refused to continue the medication), and by early December Bryan had raised two F grades to an A and a B.

During Christmas vacation Bryan rebelled when his parents refused to take him to the pool hall during a heavy rainstorm, and he subsequently disappeared for about eight days. Neither parent knew where he had been, but when he returned home on January 2, 1980, on the recommendation of Dr. Matthews but without consulting school officials, they took Bryan, very much against his will, to Shoal Creek Hospital, a psychiatric hospital. During his hospitalization Bryan received his schooling from an AISD "homebound" teacher. At the end of February 1980, on Dr. Matthews' recommendation, Mr. and Mrs. H. removed Bryan to the Brown School, a private residential school for emotionally disturbed children. This was done without consultation with, or the approval of, the school district.

Three weeks later, on January 28, 1980, the H.'s requested that the AISD assist in the costs of Bryan's residential placement. On February 29, 1980, the Central Admission Review and Dismissal Committee (Central ARD)[2] met with Mrs. H. to consider her request. At that time the committee requested reports from Dr. Matthews, reports from MH–MR, and Bryan's homebound records while at Shoal Creek Hospital. After study of all the information reports and records, the Central ARD met again with Mrs. H. on April 16, 1980. At this time Mrs. H. asked the school district to reimburse the family for all unreimbursed expenses to date, to continue to pay for Bryan's residential placement until an appropriate education placement could be provided for Bryan within the AISD, and to develop an individual educational program (IEP) for Bryan. The committee found, however, that "[b]ased on available information, this committee does not feel that Bryan meets the eligibility requirements for the emotionally disturbed." Nevertheless, the committee deemed that further information was required before a final de-

---

**2.** The Central ARD is an AISD committee which is required by state and federal law to make certain educational decisions concerning the handicapped. The committee, whose members are defendants in this suit, included a medical advisor, the AISD Supervisor for Special Education, the AISD Director of the Diagnostic Intervention Program, the AISD Coordinator of the Diagnostic Adjustment Center, and a visiting AISD teacher.

cision could be made. Mrs. H. assented to the recommendation, and a copy of this decision and recommendation for further evaluation was sent to the parents, advising them of their right to consult further and to appeal.

After further evaluation the Central ARD committee met again with Mrs. H., with her attorney present, on July 9, 1980. The committee, over the objection of the AISD Psychology Services Director, recommended that Bryan be classified as emotionally disturbed, that he be placed at the AISD Diagnostic Adjustment Center (DAC), a highly structured AISD day program for emotionally disturbed children, and that group, individual and family counseling be provided. The committee noted that residential placement was not recommended at that time. Bryan did well at the DAC where an IEP was developed for him, one of the goals being to return Bryan to a regular classroom as soon as possible. On November 13, 1980, however, Bryan left the campus, apparently because he did not want to have his picture taken "with retarded kids," and he never returned.

On November 17, 1980, the DAC local support team (a local campus committee designed to coordinate the provision of available services, including Bryan's teacher, his counselor, the DAC director, the AISD Coordinator of Special Education, and the AISD Director of Psychological Services) met with Mr. and Mrs. H. The DAC team recommended that Bryan begin a gradual transition to a regular high school and that counseling services be provided. Bryan's case was then referred to the Central ARD which met with Mrs. H. on December 17, 1980, to consider the DAC recommendations. Based on observations and reports of DAC personnel, the Central ARD determined that Bryan did not meet the eligibility designation as emotionally disturbed. They thus recommended that Bryan be transferred to Lanier High School with transitional help from special education personnel in monitoring and in securing counseling services. As with all other Central ARD recommendations, the family received a copy of the report with the usual notices concerning further questions and the right to appeal. On January 5, 1981, the Lanier Local Support Team met with Mrs. H. and her attorney. The special educational transitional services planned for Bryan and his family included hand-scheduling for Bryan and daily attendance checking, a weekly attendance check by Mrs. H., academic monitoring through teachers' biweekly written progress reports, coordinated outside counseling, and referral to the special counselor in the event of discipline problems.

Bryan registered and enrolled at Lanier, but he attended classes for only a few days in January. The instant lawsuit was filed on January 27, 1981.[3] The Lanier school officials, however, continued their efforts to help the parents reinterest Bryan in attending school, suggesting such things as half-day schedules, home visits, and homebound placement for instruction. By this time, however, the lawsuit was underway and Mr. Todd, the H.'s attorney, announced that since suit had been filed against the AISD, all communication should be between him and the AISD attorney. Thus the program

---

**3.** The plaintiffs failed to appeal any of the school district decisions or otherwise to avail themselves of the state administrative procedures prior to filing suit. After the defendants filed an unsuccessful motion to dismiss for failure to exhaust administrative remedies, however, the plaintiffs agreed to exhaust. The record is unclear on this matter, but apparently this effort was blocked by the administrative agency which refused to process the H.'s claims further because the lawsuit was pending. For purposes of this opinion only we therefore assume that the H.'s have exhausted their available state remedies, and we do so because a remand for a determination on this question would, because of the disposition we make herein, be a waste of judicial time and energy.

We want to make it absolutely clear, however, that, absent rare extenuating circumstances of a compelling nature, exhaustion of the state administrative procedures pursuant to EAHCA's provisions is a prerequisite to a lawsuit alleging violations of EAHCA, and we in no way sanction the H.'s failure here initially to exhaust their claims before filing the instant suit.

for Bryan met another obstacle, and while Bryan attended school on occasion during April and May 1981, there was no further follow-through by his parents on the special program for Bryan.

The H.'s subsequently moved out of the Austin Independent School District,[4] and the complaint was amended to remove all requests for injunctive or prospective relief.

## II.

On September 2, 1982, the district court, without reasons,[5] granted the defendants' motion for summary judgment. From that grant, the plaintiffs timely appealed.

The question before this court is thus whether there is any set of facts substantiated in the record under which the H.'s could recover restitution for out-of-pocket expenses or compensatory or punitive damages under EAHCA, section 504 or 42 U.S.C. § 1983. *See Mississippi Hospital Association, Inc. v. Heckler,* 701 F.2d 511 (5th Cir.1983).

### A.

The plaintiffs below sought restitution of approximately $7200 and actual, compensatory and punitive damages of $150,000. Their first claim for damages arises under 20 U.S.C. §§ 1401–1461 (EAHCA).

Our previous opinions have detailed the operations of EAHCA and the catalysts for its passage. *See, e.g., Stacey G. v. Pasadena Independent School District,* 695 F.2d 949, 952 (5th Cir.1983); *Tatro v. State of Texas,* 625 F.2d 557, 558–63 (5th Cir.1980) (*Tatro I*). The primary catalysts behind the passage of EAHCA were congressional findings that handicapped children were receiving inadequate services, were not being properly identified or evaluated, and were

unnecessarily being excluded from the classroom environment. 20 U.S.C.A. § 1401 (West 1978) (historical note). *See Tatro I,* 625 F.2d at 561.

To remedy this situation the Act provides public school districts with federal funding for the education of handicapped children provided that the state establishes a special education program which assures all handicapped children the right to a "free appropriate public education." 20 U.S.C. § 1412(1). Such education must be tailored to the unique needs of each handicapped child by means of an IEP developed jointly by a representative of the local education agency, the child's teacher and parents, and, where appropriate, the child himself. 20 U.S.C. § 1401(18). *See Board of Education v. Rowley,* 458 U.S. 176, 181–82, 102 S.Ct. 3034, 3038, 73 L.Ed.2d 690 (1982). The Act further provides for extensive procedural safeguards whereby the parents of a handicapped child may contest decisions regarding the child's evaluation or education in an impartial due process hearing with a final right to file suit in state or federal district court to contest final decisions in the state administrative hearing. 20 U.S.C. § 1415. *See Rowley,* 102 S.Ct. at 3039. The Act finally provides that "to the maximum extent appropriate" handicapped children must be educated "with children who are not handicapped." 20 U.S.C. § 1412(5). *See Tatro I,* 625 F.2d at 561.

### B.

The H.'s first argue that they have a claim under EAHCA for restitution for actual expenses incurred because of the school district's failure to provide Bryan with a "free appropriate education." This claim encompasses approximately $7200 in out-of-

---

**4.** The H.'s moved to the Leander School District in July 1981 in order to be closer to Mr. H.'s mother after the death of his father. Mr. and Mrs. H. did not request a special education placement for Bryan at Leander High School, and he was enrolled in a regular ninth-grade education program. Bryan was receiving low average grades at the time of Mrs. H.'s deposition and apparently was having no noteworthy problems in school.

**5.** Even though the district court failed to make findings of fact and conclusions of law on these issues, we need not remand the case because the outcome is determined primarily as a matter of law which determination we are in a position to make. *Cf. Horton v. Goose Creek Independent School District,* 690 F.2d 470, 484 (5th Cir.1983).

pocket expenses occasioned by their resort to private psychiatric counseling and later by their commitment of Bryan to a psychiatric hospital and a private residential school for emotionally disturbed children.

As recounted earlier, the H.'s took Bryan to see Dr. Matthews, the child psychiatrist, in the fall of 1979 after he declined to participate in two programs offered by the school district which are designed to reinterest problem truants in school. Because Bryan expressed no interest in the School Guidance Center, Mrs. H. cancelled his appointment. Moreover, after she was told that Bryan himself would have to express an interest in the W.R. Robbins School, she recounted his lack of interest in the Guidance Center to Robbins School personnel and cancelled his appointment there. In neither instance did the H.'s require Bryan to attend. Later, after Bryan disappeared from home for a week during the Christmas holidays, upon Dr. Matthews' recommendation and without consultation with the school district, the H.'s committed Bryan to the Shoal Creek Hospital. Three weeks later, Mrs. H. requested that the AISD assist in paying for Bryan's residential placement. Still later, after Bryan was placed at the Brown School, again without consultation with school officials, Mrs. H. requested reimbursement for all expenditures for private counseling, hospitalization, and schooling; assumption by the AISD of the costs of Bryan's residential placement until an appropriate education placement within the AISD could be provided; and the development of an IEP for Bryan.

### C.

■ This court has recently addressed a claim for retroactive reimbursement for private schooling occasioned by the parents' unilateral decision to remove their child

from the public school system and to place him or her in a private facility. In *Stacey G. v. Pasadena Independent School District,* 695 F.2d 949 (5th Cir.1983), we noted that 20 U.S.C. § 1415(e)(3)[6] requires the maintenance of the present placement of a handicapped child while the placement review is pending and that the state's duty is to fund the educational placement that it had funded prior to commencement of proceedings. Moreover, we held that federal regulation does not impose any general duty on a state to pay for the private placement of handicapped children if it has provided a free appropriate education within the public schools. If the parents disagree with the state's decisions regarding evaluation or placement of their child, "they must pursue statutory remedies to determine if the state has in fact met its obligation and whether it is financially responsible for special education requirements." *Stacey G.,* 695 F.2d at 953–54.

We thus held that neither federal nor Texas law required a school district to compensate the parents for the cost of transferring a child from public to private facilities pending judicial review of state agency placement procedures and decisions when the transfer is made without the state's consultation. *Stacey G.,* 695 F.2d at 954–55. *See also Tatro v. State of Texas,* 516 F.Supp. 968, 978 (N.D.Tex.1981) (if parents remove child from public school while proceedings are pending, they will not be reimbursed for the cost of providing appropriate private education), *aff'd,* 703 F.2d 823 (5th Cir.1983).

■ In so holding, this circuit joined six other circuits which have made similar pronouncements. *Doe· v. Anrig,* 692 F.2d 800, 810 (1st Cir.1982); *Zvi D. v. Ambach,* 694 F.2d 904, 907 (2d Cir.1982); *Stemple v. Board of Education,* 623 F.2d 893, 898 (4th

---

6. 20 U.S.C. § 1415(e)(3) provides:

During the pendency of any proceedings conducted pursuant to this section, unless the state or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or if applying for initial admission to a public school, shall,

be placed in the public school program until all such proceedings have been completed. *See also* 34 C.F.R. § 300.347 which requires the state to develop an IEP before placing a child in a private facility and 34 C.F.R. § 300.403 regarding unilateral placement of a child in a private facility.

Cir.1980); *Anderson v. Thompson,* 658 F.2d 1205, 1213 (7th Cir.1981); *Miener v. State of Missouri,* 673 F.2d 969, 980 (8th Cir.1982); *Powell v. Defore,* 699 F.2d 1078, 1081 (11th Cir.1983).[7] *Stacey G.* is thus dispositive of the H.'s claim for reimbursement for the costs of Bryan's private residential schooling.

This holding is equally applicable to the private psychiatric services which the parents unilaterally chose for Bryan.[8] The provisions of EAHCA envision full participation by all concerned parties in the identification, evaluation, and educational placement of allegedly handicapped children. *See Rowley,* 102 S.Ct. at 3050. When, however, one of the participants decides to forego the joint decision-making process in favor of unilaterally chosen alternatives, the provisions of EAHCA are undermined.

We thus find that since the H.'s chose to disregard the recommendations of the AISD officials and unilaterally decided to obtain private services for Bryan, they have no claim for restitution under EAHCA.

### D.

The H.'s next argue that they have a claim for compensatory damages under EAHCA. In support of this claim, they contend that the defendants reasonably should have known that Bryan might be emotionally disturbed[9] in 1979 but failed to refer him to special education, provided Bryan with an inappropriate individual program and placement during fall 1980, failed to provide certain services which they promised to provide, failed adequately to reevaluate Bryan prior to removing him from the DAC and returning him to a regular classroom in December 1980, and acted in bad faith by placing Bryan in the DAC rather than continuing his residential placement at the Brown School. The defendants' breach of their legal duty, continue the H.'s, resulted in Bryan's experiencing regression which he otherwise would not have experienced and in the H.'s assuming financial burdens which they would not otherwise have had to assume as well as experiencing unnecessary mental anguish.

Because the H.'s primary claim is based on the AISD's failure to correctly evaluate and educate Bryan, we briefly highlight the facts surrounding that dispute. The H.'s rely primarily on the deposition testimony of Bryan's psychiatrist, Dr. Matthews, to support their contentions. Dr. Matthews diagnosed Bryan's problem as a borderline personality disorder which crippled his ability to commit himself to attending school and which caused him to become self destructive as soon as he began to improve.[10] Dr. Matthews began seeing Bryan on October 29, 1979, and saw him weekly until January 1980 when he recommended Bryan's committment to the Shoal Creek Hospital. At the time he discharged Bryan from the hospital at the end of March 1980, Dr. Matthews projected that Bryan would need nine to eighteen months of residential treatment. Since Dr. Matthews left Austin immediately thereafter, he never saw Bryan again. He never spoke to anyone at

---

**7.** The First, Second, and Fourth Circuits in the opinions cited above based their decisions on 20 U.S.C. § 1415(e)(3), the statutory basis for our conclusion in *Stacey G.* The Sixth, Eighth and Eleventh Circuits in the cited cases reached similar conclusions but based their holdings on 20 U.S.C. § 1415(e)(2) which allows aggrieved parties to bring a civil action, and district courts to provide "such relief as the court determines is appropriate." *See infra* note 9.

**8.** We note that EAHCA does not require the state to furnish all medical treatment or therapy that a child may need. Rather a state is required to provide only those services which are required to assist a handicapped child to benefit from special education. *See* 20 U.S.C.

§ 1401(17); 34 C.F.R. § 300.13 (1982); *Tatro I,* 625 F.2d at 563.

**9.** EAHCA defines "handicapped children" as those who are

mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, *seriously emotionally disturbed,* orthopedically impaired, or other health impaired children, or children with specific learning disabilities who by reason thereof require special education and related services. (Emphasis added.) 20 U.S.C. § 1401(1). *See also* 34 C.F.R. § 300.-5(8).

**10.** This diagnosis was agreed with by personnel at Shoal Creek Hospital and the Brown School.

either Dobie Jr. High or at the DAC, nor did he have any personal knowledge of the placement which the Central ARD selected for Bryan, the IEP that was developed for him, nor of the type of counseling or the various educational alternatives available to Bryan.

As recounted earlier in the text and as reflected in deposition testimony and affidavits, AISD officials, on the other hand, made numerous suggestions to the H.'s during the spring and fall of 1979 in an effort to help the H.'s with Bryan's behavioral problems at home. After the H.'s had committed Bryan to Shoal Creek and later to the Brown School, the Central ARD, in cooperation with Mrs. H., undertook an extensive assessment of Bryan's problems, utilizing reports from the MH–MR, Dr. Matthews, Shoal Creek, the Brown School, Bryan's AISD home bound teacher, and the personal observations of Bryan at the Brown School by AISD personnel. The Central ARD found that Bryan's correct placement was the DAC rather than the Brown School or a similar residential placement, and an IEP was prepared for Bryan in accordance with state and federal guidelines. Thereafter, after observing Bryan at the DAC for three months, the DAC personnel, who had extensive experience in educating emotionally disturbed children, found that Bryan did not meet the federal guidelines for an emotionally disturbed child. They then recommended that the Central ARD place Bryan in a regular school. The Central ARD, after reviewing Bryan's past and current educational development and available reports from the DAC personnel regarding Bryan's academic and behavioral progress at the DAC, agreed with the DAC's recommendation and found that Bryan's correct placement as of December 1980 was a regular high school. We thus have a disagreement of professional opinion regarding Bryan's correct identification and educational placement.

### E.

In determining whether the "appropriate relief" authorized by EAHCA [11] includes compensatory damages in the context of the instant case we briefly review several significant aspects of EAHCA and the education of handicapped children in general.

First, EAHCA imposes extensive procedural requirements on the states which guarantee that parents will have input into the decisions regarding the education of the allegedly handicapped child. 20 U.S.C. § 1401(19). *See Rowley,* 102 S.Ct. at 3038. This procedural framework guarantees the parents an opportunity to contest any decision made by the state regarding the child's identification, evaluation, or educational placement through appropriate administrative procedures and, if necessary, in state or federal court. *See* 20 U.S.C. § 1415.

As noted by the Supreme Court in *Rowley,* the Act's emphasis on procedural safeguards, evidences a congressional intention that "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley,* 102 S.Ct. at 3050.

Second, the lack of substantive guidelines in the Act no doubt reflects congressional recognition of the lack of agreement among medical and educational professionals as to what programs are most effective for certain handicapped children and of the need for some flexibility and experimentation at the local level. *See Kruell v. New Castle County School District,* 642 F.2d 687, 691 (3d Cir.1981); Note, *Enforcing the Right to An "Appropriate Education": the Education for All Handicapped Children Act of 1975,* 92 HARV.L.REV. 1103, 1108–09 (1979). *See also* 121 Cong.Rec. 25531 (1975),

---

11. 20 U.S.C. § 1415(e)(2) provides in pertinent part:

Any party aggrieved by the findings and decision made [during the state administrative review procedures] shall have the right to bring a civil action ... which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall ... grant such relief as the court determines is appropriate.

(remarks of Congressman Albert Quie) (no one really knows what a learning disability is); *Id.* (remarks of Congressman William Lehman) (little is known about the field).

 With this background in mind, we join the Seventh, Eighth, and Eleventh Circuits, *see supra* note 5 and accompanying text, in finding that the "appropriate relief" authorized by EAHCA generally includes only prospective relief and that a damage remedy is not generally consistent with the goals of the statute. We hold, moreover, that when a school district in good faith attempts to provide a free appropriate public education to a handicapped child and has adequately complied with the procedures for determining the child's correct educational placement, it will not later stand liable to the parents for damages even if a court subsequently determines that the educational placement was incorrect. This is particularly true when the parents forego the opportunity of resolving decisional conflicts within the state administrative procedures.

 Furthermore we hold that "the appropriate relief" authorized by 20 U.S.C. § 1415(e)(2) does not include punitive damages. The statute itself provides that a state's failure to comply with EAHCA provisions may result in the withholding of federal funds for the program. 20 U.S.C. § 1416. We do not think that Congress additionally intended that a state be subjected to punitive damages which would divert even more funds from the primary goal of educating handicapped children.

 We thus hold that the H.'s have no claim for compensatory or punitive damages under EAHCA and that summary judgment was correctly granted on this claim.

## III.

The H.'s next argue that a claim for compensatory and punitive damages lies under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).[12]

### A.

This court has previously determined that a cause of action is stated under section 504 when it is alleged that a school district has *refused* to provide reasonable accommodations for the handicapped plaintiff to receive the full benefits of the school program. *See Tatro v. State of Texas,* 703 F.2d 823, 832 (5th Cir.1983) (*Tatro II*); *Helms v. McDaniel,* 657 F.2d 800, 806 n. 10 (5th Cir.1981). *Cf. Monahan v. State of Nebraska,* 687 F.2d 1164, 1170 (8th Cir.1982) (violation of § 504 requires more than mere failure to provide the "free appropriate education" mandated by EAHCA). Moreover, we have indicated that filing suit under the provisions of EAHCA does not preclude an action under section 504. *See Espino v. Besteiro,* 708 F.2d 1002 at 1008–09 (5th Cir. 1983); *Tatro II,* 703 F.2d at 831–32. Thus assuming *arguendo* that the H.'s have stated a claim under section 504,[13] the issue before the court is whether they are entitled to damages.

The remedies for a section 504 violation are those remedies set forth in Title VI of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(2). This court has previously stated that Title VI allows a private right of action to terminate the offending discriminatory activity itself by declaratory or injunctive relief. *Drayden v. Needville I.S.D.,* 642 F.2d 129, 133 (5th Cir.1981). We further stated, however, that the private right of action encompassed "no more than an attempt to have any discriminatory activity ceased" and that it did not include the right to recover back pay or any other losses. *Id.*

---

**12.** 29 U.S.C. § 794 provides in pertinent part:
No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimina-

tion under any program or activity receiving federal financial assistance. . . .

**13.** The dispute here does not involve a *refusal* to provide services but rather a disagreement over the correctness of the services provided.

A private plaintiff's right to damages under Title VI has been recently reviewed by the Supreme Court in *Guardians Association v. Civil Service Commission,* —— U.S. ——, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). Although that opinion garnered less than unanimous agreement on most issues, at least five Justices agree that there can be no private right of action under Title VI for damages absent intentional discrimination by the defendants. *See Guardians Association,* —— U.S. at —— n. 27, 103 S.Ct. at 3235 n. 27.[14] This holding is equally applicable to a claim under section 504. *See* 29 U.S.C. § 794a(a)(2).

■ A review of the record before the district court shows that the defendants at every turn endeavored correctly to assess Bryan's condition and his educational needs. Even after the instant suit was filed, the defendant school officials attempted to uncover the reasons for Bryan's lack of interest in school and his continuing absences.

Both Mr. and Mrs. H. expressly denied in their depositions that any of the defendants had intentionally tried to harm Bryan or had acted out of ill will toward either them or Bryan. They further indicated that the defendants were sincerely trying to perform their jobs and were sincerely attempting to follow state and federal guidelines by which they were bound. Thus, it would seem to be conceded that the defendants did not intentionally discriminate against Bryan or any other members of his family.

Even absent this apparent concession, the record as outlined above does not support a finding of intentional discrimination, and the H.'s claim for damages under section 504 must fail.

### IV.

Having determined that the H.'s have no claim for damages under EAHCA and section 504, we turn to their final argument— that they have a claim for damages under 42 U.S.C. § 1983.[15]

### A.

■ This court has recently held that a claim under EAHCA does not preclude an additional claim under 42 U.S.C. § 1983 for a violation of the plaintiff's constitutional rights. *Espino v. Besteiro,* 708 F.2d 1002 at 1007–10 (5th Cir.1983). Inasmuch, however, as a successful claim for a violation of the equal protection clause, as pleaded by the H.'s, requires intentional discrimination, *see Washington v. Davis,* 426 U.S. 229, 238–248, 96 S.Ct. 2040, 2046–51, 48 L.Ed.2d 597 (1976), the H.'s claim for a constitutional violation must fail. *See* Part III. B.

### B.

■ Left open in *Espino,* however, was the question of whether 42 U.S.C. § 1983 could be used as a vehicle to enforce a violation of EAHCA.[16] Today we answer

---

**14.** Justices White and Rehnquist would not allow compensatory relief in the absence of proof of discriminatory intent. Justice Powell and the Chief Justice would preclude private relief under Title VI in all circumstances. Justice O'Connor would preclude compensatory relief absent a showing of discriminatory animus.

**15.** 42 U.S.C. § 1983 provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

**16.** The *Espino* panel approvingly noted that the district court in *Tatro v. Texas,* 516 F.Supp. 968, 984 (N.D.Texas, 1981), held that as long as a plaintiff had exhausted his administrative remedies, a suit under EAHCA did not foreclose a § 1983 claim. The district court continued, however, that "if exhaustion of administrative remedies is required under both the EAHCA and Section 1983, and all proved damages are available under the EAHCA ... [then] Section 1983 serves no purpose other than that of a conduit for attorney's fees." *Tatro,* 516 F.Supp. at 984. The final holding in regard to the section 1983 discussion was that "where Section 1983 has no greater role than the statute it purportedly 'enforces', its citation will not trigger the Section 1988 attorney fee provisions." *Tatro,* 516 F.Supp. at 984.

the question in the negative.[17] In conclud-ing that EAHCA provides an exclusive remedy, we are guided by the Seventh Circuit's analysis in *Anderson v. Thompson*, 658 F.2d 1205, 1214–17 (7th Cir.1981).

EAHCA itself provides both a private right of action and a comprehensive administrative and judicial enforcement system. The emphasis of the Act is on the procedural framework which guarantees parents and school officials an opportunity to make decisions jointly regarding the evaluation and education of a handicapped child. *See Rowley*, 102 S.Ct. at 3050. The framework focuses on the opportunity to resolve conflicts in a nonjudicial setting through an elaborate administrative hearing process. Indeed the jurisdiction of a state or federal court is granted solely to parties aggrieved by the findings and decision in an administrative hearing conducted by the state or local educational agency. 20 U.S.C. § 1415(e)(2). The requirement that conflicts first be resolved through the state administrative process would be utterly undermined if a plaintiff could resort to section 1983 for an EAHCA violation since section 1983 does not require administrative exhaustion. *See Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982).

Moreover, the remedies which EAHCA provides are entirely inconsistent with section 1983 relief. Since we have held today that 20 U.S.C. § 1415(e)(2) does not provide a general damages remedy, allowing the supplementary relief afforded by section 1983, *see Carey v. Piphus*, 435 U.S. 247, 252, 258–59, 98 S.Ct. 1042, 1046, 1049, 55 L.Ed.2d 252 (1978), would thwart that holding, and thus section 1415(e)(2) could not be given "unimpaired effectiveness." *See Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 378, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979).

We thus find that EAHCA provides the "comprehensive enforcement scheme" envisioned in *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981), and that "the enforcement procedure may not be bypassed by bringing suit directly under § 1983." *Id.* The H.'s thus have no claim under 42 U.S.C. § 1983.

#### V.

After reviewing the record before the district court we find that no claim for damages is available to the H.'s under any of the cited statutes for the reasons stated in Parts II through IV, *supra*. We thus affirm the grant of summary judgment in favor of the defendants.

AFFIRMED.

---

**17.** The Seventh, Fourth, and Eleventh Circuits have previously found that § 1983 is unavailable to enforce an EAHCA violation. *See Anderson v. Thompson*, 658 F.2d 1205, 1217 (7th Cir.1981); *McGovern v. Sullins*, 676 F.2d 98, 99 (4th Cir.1982); *Powell v. Defore*, 699 F.2d 1078, 1082 (11th Cir.1983).