**Linda Gail NIECE and Grant H. Hendrick, on behalf of all other similarly situated people with disabilities, Plaintiffs,**

v.

**Deputy Warden Pat FITZNER, Director Kenneth McGinnis, Warden Richard Johnson, Assistant Resident Unit Manager Tabor, Inspector Lockwood, Assistant Deputy Warden Roberts, Captain Hancock, Special Assistant Brown, Michigan Department of Corrections, the individuals are being sued in their individual and official capacities, Defendants.**

Civil Action No. 94–CV–70718–DT.

United States District Court,
E.D. Michigan,
Southern Division.

March 29, 1996.

Michael J. Steinberg, Ann Arbor, MI, for Plaintiffs.

A. Peter Govorchin, Lansing, MI, for Defendants.

### ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

BORMAN, District Judge.

The Court has reviewed the Magistrate Judge's Report and Recommendation submitted herein, and all timely objections filed thereto. The Report and Recommendation is hereby accepted. Accordingly,

IT IS ORDERED that Defendants' Motion to Dismiss the Americans with Disabilities Act claims asserted against Defendants Roberts and Lockwood is GRANTED. Defendants' Motion to Dismiss the Americans with Disabilities Act claims asserted against the remaining Defendants, as well as the remaining claims against all Defendants is DENIED.

### REPORT AND RECOMMENDATION

KOMIVES, United States Magistrate Judge.

### I. RECOMMENDATION:

The Court should deny defendants' motion under Fed.R.Civ.P. 12(b)(6) to dismiss plaintiff's claims under the Americans with Disabilities Act for failure to state a claim upon which relief may be granted, except as to defendants Lockwood and Roberts.

## II. *REPORT:*

### A. *Procedural Background*

1. Plaintiffs bring this action under 42 U.S.C. § 1983 (§ 1983), Titles II and IV of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12134, 12203, Section 504 of the Rehabilitation Act of 1973 (§ 504), 29 U.S.C. § 794, and the Michigan Handicappers Civil Rights Act, MCL 37.1101 *et seq.* Plaintiffs are Linda Niece, a 45–year–old deaf woman, and Grant Hendrick, a prisoner who is currently incarcerated at Carson City Temporary Facility (OTF).

Defendants are Michigan Department of Corrections (MDOC); Kenneth McGinnis, Director of the MDOC; Richard Johnson, Warden of OTF; Pat Fitzner, Deputy Warden of OTF; Tabor, a counselor at OTF; Lockwood, an inspector at OTF; Roberts, Assistant Deputy Warden at OTF; Hancock, a captain at OTF; and Brown, a special assistant at OTF. Defendants McGinnis, Johnson, and Fitzner are sued in their individual and official capacities, and defendants Tabor, Lockwood, Roberts, Hancock and Brown are sued in their individual capacities.

Plaintiffs' complaint consists of 32 pages and 164 numbered paragraphs.[1] Plaintiffs summarize their complaint in their brief in opposition to defendants' motion to dismiss as follows:

> Plaintiffs Niece and Hendrick are engaged to be married upon Hendrick's release from prison. Hendrick is incarcerated at OTF in Carson City, which is over 100 miles from Niece's home in St. Clair Shores. Due to her ataxia, it is difficult for Niece to travel to Carson City to visit Hendrick, even when she is able to find a willing driver. Since Niece is deaf, she is unable to communicate with Hendrick over the telephone in the same manner that individuals who can hear communicate with their friends and relatives who are in prison. The only way that Niece is able to communicate over the telephone is through the use of a Telecommunications Device for the Deaf (TDD). (Complaint, ¶¶ 27–32).

> A TDD is a device with a keyboard and screen that is easy to hook up to a telephone. It permits individuals to type messages to the other party on the keyboard and receive messages in return over the screen. Plaintiff Niece has a TDD in her home which permits her to readily communicate with anyone who has access to another TDD. (Complaint, ¶¶ 30–31).

> Niece may also communicate over the phone with a hearing person who does not have a TDD by using a TDD/Relay operator. The relay operator "translates" voice messages from the hearing person into typed messages for the person using the TDD and visa versa. The relay operator may be accessed anywhere in Michigan by dialing a 1–800 toll-free number. Once the parties are connected they will pay the normal rates. The TDD/Relay operator may make a collect call for a hearing person to a person with a TDD and the person using the TDD is able to accept the call. (Complaint, ¶ 41).

> In early September, 1989, Niece purchased a new TDD from Michigan Bell for $168.00 and attempted to donate it to OTF. Niece offered to donate the TDD so that (1) she would be able to communicate with Plaintiff Hendrick over the telephone, (2) OTF staff could reach her quickly to notify her of an emergency involving Plaintiff Hendrick, and (3) deaf relatives or friends of other OTF inmates could communicate with their loved ones over the telephone and be notified in case of an emergency. Plaintiff Hendrick wrote to Defendant Inspector Lockwood about Niece's offer to donate the TDD, but Lockwood flatly refused to accept the TDD or provide Plaintiffs with access to a TDD at OTF. (Complaint, ¶¶ 35–40).

> In November, 1990, Hendrick communicated with Defendant Assistant Deputy Warden Larry Roberts about making an exception to the rule against access to toll-free telephone numbers so that he and Ms. Niece could communicate via the TDD/relay operator. Defendant Roberts refused to make an exception. Roberts further agreed that plaintiffs would withdraw their allegations for class certification.

---

1. The complaint contains class action allegations; however, on May 22, 1994, the parties

suggested that it was Hendrick's own fault for not being able to communicate with Niece because Hendrick chose a deaf person to be his girlfriend. (Complaint, ¶¶ 42–45).

Hendrick filed a grievance against Roberts which was denied. He then filed a Step II grievance appeal with Defendant Warden Richard Johnson and a Step III grievance appeal with Defendant Kenneth McGinnis, Director of the MDOC. Hendrick sent a 12–page type-written letter with the appeal to Director McGinnis setting forth in detail the rights of those with disabilities under the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973. He asked that he be able to communicate with Niece either directly from a TDD at OTF to Niece's TDD, or from a prison voice phone to Niece's TDD via the relay operator. Director McGinnis denied the appeal in May, 1992 (Complaint, ¶¶ 46–49).

In June, 1992, Hendrick filed a complaint with the Department of Justice (DOJ) regarding the MDOC's violations of the ADA. The MDOC learned about the complaint soon after it was filed.

Prior to the filing of the DOJ complaint, Defendants had always permitted Plaintiff Niece to bring a plastic tumbler and a straw into the visiting room when she came to visit Hendrick. Due to her ataxia, Niece could not drink from the paper cups provided in the visiting room without spilling. To accommodate her disability, Niece had received permission in 1989 to bring her tumbler and straw into the visiting room. Defendants permitted her to bring the cup with her, without incident, on dozens of visits between 1989 and the time that the DOJ complaint was filed. However, in July 1992, on her first visit since the filing of the DOJ complaint, Defendant Captain Hancock, prevented her from bringing in the tumbler and the straw. (Complaint, ¶¶ 52–56).

In November, 1992, Niece, with the assistance of The National Center for Law and Deafness, filed her own complaint with the DOJ's Civil Rights Division about the MDOC's failure to accommodate her disabilities. The DOJ entered negotiations with the MDOC about TDD access in late, 1992. In January, 1993, Niece was again prevented from bringing her plastic tumbler in the visiting room, causing her embarrassment and humiliation when she unsuccessfully attempted to drink from a thin, paper cup from the visiting room vending machine. (Complaint, ¶¶ 58–60).[2]

In April 1993, Hendrick learned of a new phone policy about to be instituted throughout the MDOC called the "PIN system." Under the PIN system, an inmate is given a personal identification number (PIN) which permits him to make telephone calls from a list of 10 pre-approved, pre-programmed telephone numbers. Hendrick wrote to Constance Henslee of the DOC Administrative Services. Hendrick asked Ms. Henslee whether the new system would allow access to the Relay Center. He also explained to Ms. Henslee that, under the new PIN system, it would be easy for the MDOC to pre-program the phone number of the TDD Relay Center for certain prisoners, yet block access to other 1–800 numbers. Hendrick was told that he would not be able to access the relay center under the new system. (Complaint, ¶¶ 61–62).

Due to pressure placed on the MDOC by a DOJ investigator to give plaintiffs access to TDD communications, the MDOC finally promised the investigator that they would install a TDD in Carson City. However, the MDOC did not make plans to install a TDD at plaintiff's minimum security facility, Carson City Temporary Facility (OTF). Rather, they planned on installing it in the higher security Carson City Regional Facility (DRF). (Complaint, ¶¶ 63–66).

In September 1993, Defendant Fitzner, against Hendrick's expressed wishes, ordered that Hendrick be transferred from OTF to DRF because of Plaintiff's request for use of TDD equipment. Plaintiff immediately filed a grievance on the ground that he was being retaliated against for complaining to the DOJ. When the grievance was denied, he filed a Step II grievance appeal to Defendant Warden Richard

2. Defendants still are refusing Niece to bring her plastic cup into the visiting room.

Johnson and a Step III grievance appeal to Defendant Director McGinnis. Warden Johnson sent Defendant Special Assistant Brown to meet with Hendrick. Brown said that she was aware that Hendrick had met with counsel Daniel Manville and wanted to know whether Hendrick was going to file a federal lawsuit in addition to the DOJ complaint. Brown said that Warden Johnson would agree to immediately return him to OTF and restore his job only if he agreed to release all MDOC employees from liability and if he agreed never to request access to a TDD again (Complaint, ¶¶ 69–98).

Because Hendrick desperately wanted to be returned to OTF and because of the pressure placed on him by Defendants Johnson and Brown, Hendrick drafted a "statement of understanding" that both purported to "release" Defendants from liability and detailed the coercive circumstances surrounding the release. Warden Johnson was unhappy about the way the "release" was drafted and rejected it. (Complaint, ¶¶ 99–103).

In late October, 1993, the MDOC informed an investigator from the DOJ that it would not return Hendrick to OTF because Plaintiff had filed a lawsuit.[3] The investigator then informed the MDOC that Hendrick's case was being turned over to the Attorney General for prosecution of the MDOC for retaliating against Hendrick. Because of the threatened prosecution, the MDOC returned Hendrick to OTF, gave him back his job, and compensated him for loss (sic) wages. Additionally, on November 10, a TDD was finally delivered to OTF (Complaint, ¶¶ 105–113).

Although a TDD was finally delivered to OTF, Defendants have severely limited Hendrick's ability to gain access to the TDD. Thus, the opportunity for Niece and Hendrick to communicate over the phone is drastically inferior than the opportunity for hearing friends and relatives to communicate with inmates. The TDD must be used in the counselor's office and may only be used when a counselor is ready, able and willing to hook up the TDD and wait while Hendrick places a call. Often counselors are too busy or simply unwilling to allow Hendrick to use the phone. Hendrick can never gain access to the TDD during meal times, shift changes and officer breaks. (Complaint, ¶¶ 114–119).

Inmates who use voice phones do not face the impediments to phone communication faced by inmates who use TDD's. They do not need to gain permission or assistance from corrections officers to use the phone. Rather, voice phones are readily available to inmates most of the day from 7 A.M. to 11:30 P.M.

Plaintiffs have proposed reasonable modifications to the current system that would provide equal access to phone communications for deaf. Namely, Plaintiffs ask that Defendants program the PIN system to permit Hendrick to place a collect call to Niece through the TDD/Relay operator. In the alternative, Plaintiffs have requested that Defendants install a TDD phone near the voice phones so that calls do not need to be placed from the counselor's office.

Although it initially appeared that Defendants were willing to install a TDD on a separate line outside the counselors' office, they have yet to do so. Additionally, although Niece has made a formal written request to bring a plastic tumbler into the visiting room as she did for years before this litigation, Defendants have denied her request.

(Plaintiffs' Brief, pp. 3–10).

2. On May 18, 1994, defendants filed a motion to dismiss Counts I and II of plaintiff's complaint[4] for failure to state a claim upon which relief can be granted under Fed. R.Civ.P. 12(b)(6). Defendants assert that (1) any claims plaintiff Niece may have under

---

3. No civil lawsuit had been filed at this time.

4. Counts I and II allege violations of the ADA asserted by Plaintiff Niece and Plaintiff Hendrick, respectively (Complaint ¶¶ 120–135, 136–144). Defendants have made no motion with respect to plaintiffs' claims under section 504 of the Rehabilitation Act of 1973; 42 U.S.C. § 1983; or the Michigan Handicappers Civil Rights Act.

the ADA must be based on events after January 26, 1992; (2) plaintiff Hendrick lacks standing to pursue a claim under the ADA because he is not disabled; and (3) plaintiff Niece cannot establish that she was discriminated against. In the alternative, defendants ask the Court to dismiss plaintiffs' claims against the individual defendants and plaintiffs' claims for monetary damages to compensate for mental anguish and humiliation.

3. Plaintiffs filed a brief in opposition to defendants' motion to dismiss on July 10, 1995.

**B. *Motion to Dismiss Standard***

■ A motion to dismiss for failure to state a claim upon which relief can be granted is provided for in Fed.R.Civ.Pro. 12(b)(6). In order for a court to dismiss a complaint for failure to state a claim, it must appear beyond doubt that plaintiff can prove no set of facts supporting his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Plaintiff is not required to specifically set out the facts upon which he bases his claim. *Id.* at 47, 78 S.Ct. at 102–03. Rather, "a short and plain statement of the claim" pursuant to Fed.R.Civ.Pro. 8(a)(2) gives defendant fair notice of plaintiff's claim and the grounds upon which it rests. *Id.*

■ The reviewing court must construe the complaint in the light most favorable to plaintiff and must presume all factual allegations in the complaint as true. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). The purpose of Rule 12(b)(6) is to give defendant the opportunity to test whether plaintiff is entitled to legal relief as a matter of law even if everything alleged in the complaint is true. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. at 48, 78 S.Ct. at 103. A dismissal under 12(b)(6) is generally

disfavored by courts, as it is a dismissal on the merits. 2A Moore's Federal Practice ¶ 12.07.

■ A court can only decide a 12(b)(6) motion on the basis of the pleadings. *Song v. City of Elyria, Ohio,* 985 F.2d 840, 842 (6th Cir.1993). Dismissal is appropriate if the complaint fails to set forth an allegation of a required element of a claim. *See Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489–90 (6th Cir.1990). The Court can treat the motion as one for summary judgment if "matters outside the pleading are presented to and not excluded by the court." Fed. R.Civ.Pro. 12(b).

**C. *Analysis***

1. *Effective Date of the Americans with Disabilities Act*

■ The defendants' first argument is that any claims of plaintiff Niece under the ADA must be based on events occurring after January 26, 1992, the effective date of the Act. The ADA does not provide for retroactive effect, and the various courts considering the question have held that the Act cannot be applied retroactively. *E.g., O'Bryant v. Midland,* 9 F.3d 421, 422 (5th Cir.1993); *Noel v. Cornell University Medical College,* 853 F.Supp. 93 (S.D.N.Y.1994). Because the complaint alleges no actions by defendant Roberts or defendant Lockwood occurring after January 26, 1992, plaintiffs' ADA claims against these two defendants should be dismissed.[5]

2. *Plaintiff Hendrick's Standing to Sue under the ADA*

■ Defendants contend that plaintiff Hendrick lacks standing to sue under the ADA because he is not "disabled" within the meaning of the Act. Plaintiff Hendrick alleges in his complaint two grounds upon which he comes under the ADA. The first is 42 U.S.C. § 12132, which provides:

Subject to the provisions of this chapter, no qualified individual with a disability

---

5. Plaintiffs do not object to dismissing their ADA complaints with respect to these two defendants (Plaintiff's Brief at 10). As plaintiffs correctly point out, all other claims against these defendants remain.

shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

*Id.* Under regulations promulgated by the Attorney General pursuant to 42 U.S.C. § 12134(a), this section also protects a person who is not disabled from discrimination based on his known association with a disabled person:

A public entity shall not exclude or otherwise deny equal services, programs or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

28 C.F.R. § 35.130(g) (1995).[6] As this regulation clarifies, Title II protects interaction between persons with a disability and those without by providing a separate cause of action to individuals discriminated against because of their relationship with a person with a disability.

In Title II, Congress specifically granted an independent right of action to individuals who are not disabled but are discriminated against because of their known association with a person with a disability.... The regulations give broad protection to anyone associated with an individual with a disability, not just those with a familial relationship.

*Tugg v. Towey,* 864 F.Supp. 1201, 1208 (S.D.Fla.1994) (citation omitted). Plaintiff Hendrick alleges in his complaint that he was discriminated against because of his known association with a person with a disability

(Complaint ¶¶ 140–141), and therefore has stated a claim upon which relief may be granted under 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(g).

■ The second ground alleged by Plaintiff Hendrick as a basis for relief under the ADA is 42 U.S.C. § 12203(a), which provides:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

*Id.* To state a claim under this section a plaintiff need only allege that: 1) he engaged in an activity protected by the section; 2) the public entity took adverse action against him; and 3) there is a causal link between his engagement in the protected activity and the adverse action. *See, Harmer v. Virginia Electric & Power Co.,* 831 F.Supp. 1300, 1308 (E.D.Va.1993) (establishing similar requirement for allegations in the Title I employment context); *Doe v. Kohn, Nast & Graf, P.C.,* 862 F.Supp. 1310, 1316 (E.D.Pa.1994) (same). Plaintiff Hendrick has properly stated a claim under 42 U.S.C. § 12203 by alleging in his complaint that his transfer to DRF was in retaliation for his complaint to the DOJ about lack of access to a TDD his subsequent participation in the DOJ investigation (Complaint ¶¶ 143–144).

3. *Plaintiff Niece's Claims under the ADA*

■ Defendants argue that plaintiff Niece has failed to state a claim upon which

---

**6.** In his complaint, plaintiff Hendrick mistakenly cites 28 C.F.R. § 35.13*1* (g), instead of the correct cite, § 35.13*O*(g). Defendants point out that there is no such section 35.131(g), and argue that plaintiff fails to make out a claim based on his relationship to plaintiff Niece.

Under Fed.R.Civ.P. 8(a)(2), a plaintiff need only make "a short and plain statement of the claim showing that the pleader is entitled to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The purpose of pleading under Fed.R.Civ.P. 8(a) is to afford the adverse party "fair notice of the claim asserted ... which will enable the adverse party to answer and prepare for trial...." 2A Moore's

Federal Practice ¶ 8.13, at 8–58 (2d ed. 1992); *see, Monks v. Marlinga,* 923 F.2d 423 (6th Cir. 1991). In this case, plaintiff's allegations afford fair notice of the claim to defendants. The complaint clearly alleges that certain of defendants' conduct "constitutes discrimination and a denial of the benefits of services, programs, or activities based on [plaintiff Hendrick]'s relationship with an individual with a known disability, contrary to 42 U.S.C. § 12132" (Complaint ¶¶ 140–141). The subsequent citation to the incorrect regulation section in the complaint does not alter the clear, fair notice afforded by the allegations contained within ¶¶ 140–141. *See,* 2A Moore's Federal Practice ¶ 8.13, n. 15, and cases cited therein.

relief can be granted under the ADA because she cannot establish that she was discriminated against as a result of the "legitimate security restrictions imposed on prisoners' privilege of using the telephone" (Defendants' Brief at 7).

Plaintiff first alleges that she was discriminated against in the receipt of services by a public entity in violation of 42 U.S.C. § 12132 and 28 C.F.R. §§ 35.130(b)(1)(ii), 35.160. 28 C.F.R. § 35.130(b)(1)(ii) provides:

A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

. . . .

(ii) Afford a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others[.]

*Id.*

Further, 28 C.F.R. § 35.160(b)(1) provides:

A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

*Id.* A TDD is an auxiliary aid under the ADA. 42 U.S.C. § 12102(1); 28 C.F.R. § 35.104(1).

Defendants argue that Plaintiff Niece was not an individual qualified to receive any service of the prison, and therefore is not able to recover under 42 U.S.C. § 12132. They claim that the only service offered by the prison is the privilege given to prisoners to place outgoing telephone calls. Such a narrow reading of the phrase "qualified individual" would defeat the purpose of the statute and Congress' intent in passing it. "In determining the meaning of [a] statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990); *see also, Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987) (quoting *United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)).

A "qualified individual with a disability" is defined in Title II as, among others, a person who meets the eligibility requirements for the receipt of services provided by a public entity, either with or without the provision of auxiliary aids. 42 U.S.C. § 12131(2). In order to give effect to the ADA's purpose of eliminating discrimination against persons with disabilities by "invok[ing] the sweep of congressional authority," most courts have given a broad reading to the term "service." *See, e.g., Independent Housing Services of San Francisco v. Fillmore Center Associates,* 840 F.Supp. 1328, 1344 (N.D.Cal.1993) (bond financing for low income housing projects is "service" within meaning of § 12132 under government agency's "program" of urban renewal).[7]

In *Aikins v. St. Helena Hospital,* 843 F.Supp. 1329 (N.D.Cal.1994), the court interpreted the Rehabilitation Act's similar provision regarding "otherwise qualified" individuals. The court ruled the defendant hospital must provide a sign language interpreter to a deaf woman during her husband's illness. The court rejected defendant's argument that plaintiff was not entitled to any service, saying she was " 'otherwise qualified' to discuss her husband's condition with hospital officials." *Aikins,* 843 F.Supp. at 1337. Similarly, defendants provide a service to persons who are not inmates in allowing them to be called by inmates and allowing them to visit inmates in person. Plaintiff Niece meets the eligibility requirement for these services under the prison regulations,

---

7. Defendants offer *Crowder v. Kitagawa,* 842 F.Supp. 1257 (D.Haw.1994), as taking the opposite stance. *Crowder* is distinguishable, however, in that it did not involve the provision of a service, but rather the application of a public health law designed to prevent the spread of rabies, which the court concluded was not intended to be affected by the ADA. *Crowder,* 842 F.Supp. at 1267. To the contrary, the ADA and its accompanying regulations make perfectly clear that one of the primary goals of the Act is to eliminate communications barriers between the hearing-impaired and the rest of the population. *See,* 42 U.S.C. §§ 12101(a)(5), (b)(1); 28 C.F.R. §§ 35.160, 35.161 (1995).

as she is one of plaintiff Hendrick's designated visitors and has been allowed to visit him. *See also, Rothschild v. Grottenthaler,* 907 F.2d 286, 290 (2d Cir.1990) (Under Rehabilitation Act, deaf parents of hearing school children are " 'otherwise qualified' for the parent-oriented activities incident to their children's education"). Therefore, under the ADA, the defendants must make reasonable accommodation to provide for her disability.

▪ Defendants also argue that use of the phones by inmates is a privilege, and is therefore subject to reasonable restrictions.[8] This argument, however, misses the point. The ADA does not require a government entity to provide any particular service. Rather, the ADA requires that, if the entity does in fact provide a service to the general public, "it must use methods or criteria that do not have the purpose or effect of impairing its objectives with respect to individuals with disabilities." *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 846 F.Supp. 986, 991 (S.D.Fla. 1994).

▪ Finally, defendants argue that plaintiff Niece's claims under the ADA should be dismissed because the policy they eventually adopted (allowing Niece to be phoned by Hendrick through a TDD) was a reasonable accommodation as required by the ADA. However, reasonableness of an accommodation under the ADA is a question of fact appropriate for resolution by the trier of fact and not by the Court on a motion under Fed.R.Civ.P. 12(b)(6). *Torcasio v. Murray,* 862 F.Supp. 1482, 1492 (E.D.Va.1994); *see also, McGregor v. Louisiana State University Board of Supervisors,* 3 F.3d 850, 855 (5th Cir.1993) (involving similar claim under Rehabilitation Act).

▪ Plaintiff also alleges that she was retaliated against for participating in the Department of Justice (DOJ) investigation of the prison in violation of 42 U.S.C. § 12203 (Complaint ¶ 131). As already discussed, to state a claim under this section Plaintiff

Niece only need allege that: 1) she engaged in an activity protected by the section; 2) defendants took adverse action against her; and 3) there is a causal link between her engagement in the protected activity and the adverse action. *See, Harmer v. Virginia Electric & Power Co.,* 831 F.Supp. 1300, 1308 (E.D.Va.1993) (establishing similar requirement for allegations in the Title I employment context); *Doe v. Kohn, Nast & Graf, P.C.,* 862 F.Supp. 1310, 1316 (E.D.Pa.1994) (same). Furthermore, 42 U.S.C. § 12203 "applies to all investigations or proceedings initiated under the Act or this part without regard to the ultimate resolution of the underlying allegations." 28 C.F.R. Part 35, App. A, at 455 (1994).

Plaintiff alleges in her complaint that defendants refused to allow her to drink from a plastic tumbler with handles on her visits to the prison in retaliation for her complaint to the DOJ and her participation in the DOJ investigation (Complaint ¶ 131). Therefore, she has properly stated a claim upon which relief may be granted.

### 4. *Plaintiffs ADA Claims Against Individual Defendants*

▪ Defendants argue that, if the Court does not dismiss plaintiffs' ADA claims in their entirety, the Court should dismiss plaintiffs' ADA claims as to the individual defendants because they are not "public entities" under Title II. 42 U.S.C. § 12132, upon which the complaint relies, states that no person with a disability "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity . . . ." *Id.*

▪ There is nothing within Title II which explicitly authorizes or prohibits suits against public actors acting in their official or individual capacities. The Americans with Disabilities Act is a broad, remedial statute enacted to eliminate discrimination against

---

**8.** Defendants' contention that the use of the telephone by inmates is merely a privilege is unconvincing. Although it is true that a prisoner's right to use telephones is subject to rational limitations, "persons incarcerated in penal institutions retain their first amendment rights to communicate with family and friends." *Washington v. Reno,* 35 F.3d 1093, 1100 (6th Cir. 1994).

disabled persons. As such, it must be construed broadly to carry out its purpose. *Kinney v. Yerusalim,* 812 F.Supp. 547 (E.D.Pa.1993). "The plain meaning of the statute dictates that public actors may not exclude disabled people from the services of a public institution. Thus, [actions of] public actor[s] such as Defendant[s] fall[ ] within the ambit of the Act" if plaintiff is excluded from services offered by the public institution. *Doe v. Marshall,* 882 F.Supp. 1504, 1507 (E.D.Pa.1995).

Furthermore, plaintiffs assert claims for retaliation based on 42 U.S.C. § 12203(a), which by its stated terms applies to individuals.

5. *Plaintiffs' Claims for Monetary Damages Based on Mental Anguish and Humiliation*

 Defendants further claim that monetary damages based on mental anguish and humiliation are not recoverable under the ADA. " 'Where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' " *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 66, 112 S.Ct. 1028, 1033, 117 L.Ed.2d 208 (1992) (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)). Title II provides:

> The remedies, procedures, and rights set forth in section 794a of Title 29 [the Rehabilitation Act of 1973] shall be the remedies, procedures and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.

42 U.S.C. § 12133. This same remedies provision applies to plaintiffs' retaliation claims under 42 U.S.C. § 12203(c). The remedies provided by the Rehabilitation Act of 1973, 29 U.S.C. § 794a(a)(2), are those remedies provided for under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

Recently, the Supreme Court held that Title IX of the Civil Rights Act affords the full range of remedies, unlimited by Congress. *Franklin,* 503 U.S. at 71–73, 112 S.Ct. at 1035–36. "[B]ecause Title IX was patterned after Title VI and Congress intended to create Title IX remedies comparable to those available under Title VI . . . , the Court's holding on Title IX in *Franklin* applies equally to Title VI and Section 504 [of the Rehabilitation Act] cases." *Rodgers v. Magnet Cove Public Schools,* 34 F.3d 642, 644 (8th Cir.1994) (citations omitted). Therefore, plaintiffs are afforded the full range of legal remedies under the Rehabilitation Act. *Rodgers,* 34 F.3d at 645; *see also, Pandazides v. Virginia Board of Education,* 13 F.3d 823, 830 & n. 9 (4th Cir.1994); *Miener v. Missouri,* 673 F.2d 969, 979 (8th Cir) ("damages are available under § 504 as a necessary remedy for discrimination against an otherwise qualified handicapped individual"), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *Smith v. Barton,* 914 F.2d 1330, 1338 (9th Cir.1990) ("plaintiffs suing under section 504 of the rehabilitation act 'may pursue the full panoply of remedies, including . . . monetary damages' ") (citation omitted), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991); *Waldrop v. Southern Co. Services, Inc.,* 24 F.3d 152, 156–57 & n. 5 (11th Cir.1994). Consequently, compensatory damages are available to plaintiffs asserting claims under 42 U.S.C. §§ 12132 and 12203.[9]

D. *Conclusion*

In view of the foregoing, the Court should deny defendants' motion under Fed.R.Civ.P. 12(b)(6) to dismiss plaintiff's claims under the Americans with Disabilities Act for failure to state a claim upon which relief may be granted, except as to defendants Lockwood and Roberts.

---

**9.** There are some cases holding that compensatory damages under the ADA or Rehabilitation Act are limited to situations in which there has been intentional discrimination. *See, e.g., Marvin H. v. Austin Independent School District,* 714 F.2d 1348, 1357 (5th Cir.1983); *Tyler v. City of Man-* *hattan,* 849 F.Supp. 1442, 1443–44 (D.Kan. 1994). Even assuming, *arguendo,* that these cases correctly state the law, defendants' motion on the remedies issue would have to be denied, as the plaintiffs have alleged intentional discrimination (Complaint ¶¶ 131, 142–43, 158).

As to the plaintiffs' ADA claims against defendants Lockwood and Roberts, the court should grant defendants' motion to dismiss for failure to state a claim because all actions of these defendants took place before the effective date of the Act. However, all other claims against these defendants should remain.

### III. *NOTICE TO PARTIES REGARDING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D.Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health & Human Services,* 932 F.2d 505 (6th Cir.1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Smith v. Detroit Federation of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987); *Willis v. Secretary of Health & Human Services,* 931 F.2d 390, 401 (6th Cir.1991). Pursuant to E.D.Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.